**STATE CAPITOL BANK OF OKLAHOMA CITY, Oklahoma, Appellant,**

v.

**James H. NORICK and C. H. Simpson, Appellees.**

**No. 49068.**

Court of Appeals of Oklahoma, Division No. 2.

April 27, 1976.

Released for Publication by Order of Court of Appeals May 20, 1976.

Fuller, Tubb & Pomeroy, Oklahoma City, for appellant.

Robert H. Gilliland, Jr., and John N. Hermes, McAfee, Taft, Mark, Bond, Rucks & Woodruff, Oklahoma City, for appellee James H. Norick.

Roland Tague and Francis S. Irvine, Kerr, Davis, Irvine, Burbage, Krasnow & Rhodes, Oklahoma City, for appellee C. H. Simpson.

BRIGHTMIRE, Judge.

A bank brings this action against two limited guarantors of a promissory note to recover an unpaid balance. The trial court granted defendants a summary judgment on the ground an amount in excess of their agreed liability limits had been paid on the note. Bank assails the ruling for being, it says, contrary to the guarantors' agreement.

I

On August 10, 1967, Spring Creek Memorial Cemetery, Ltd. (SCMC, Ltd.), a

limited partnership, gave plaintiff, State Capitol Bank, its $70,000 interest-bearing promissory note payable in monthly installments of $1,000 plus interest, beginning September 10, 1967.

Concurrent with the execution of this note defendants Charles H. Simpson and James H. Norick each signed a "Loan Guaranty Agreement," which provided in pertinent part as follows:

"For Value Received and to enable SPRING CREEK MEMORIAL CEMETERY, LTD. of Oklahoma City, Oklahoma, hereinafter designated as 'Debtor,' to obtain credit, from time to time, of State Capitol Bank, we hereby request said Bank to extend to said Debtor such credit as said Bank may deem proper, and we hereby jointly and severally guarantee the full and prompt payment to said Bank at maturity, and at all times thereafter, and also at the time hereinafter provided, of any and all indebtedness, liabilities and obligations of every nature and kind of said Debtor to said Bank, and every balance and part thereof, whether now owing or due, or which may hereafter, from time to time, be owing or due, and howsoever theretofore or hereafter created or arising or evidenced, to the extent of Forty Six Thousand Two Hundred Fifty & no/100 _ _ _ Dollars, and we jointly and severally also agree to pay in addition thereto, all costs, expenses and reasonable attorney's fees at any time paid or incurred in endeavoring to collect said indebtedness, liabilities and objections, and in and about enforcing this instrument.

. . . . . .

"The granting of credit from time to time by said Bank to said Debtor in excess of the amount of this guaranty and without notice to the undersigned, is hereby authorized and shall in no way affect or impair this guaranty."

In order to understand the issues raised it is necessary to describe some of the intricate background details. The debtor, SCMC, Ltd., was organized August 20, 1965, for the purpose of owning and operating a cemetery. Among its eight partners was one general one, Norsim, Inc., which held a 45 percent share in the partnership. Simpson and Norick each owned half of the Norsim, Inc. stock.

Also in existence at this time was Spring Creek Memorial Cemetery Corporation (SCMC Corp.), incorporated on March 12, 1963. The officers and stockholders in SCMC Corp. were the same ones who were partners in SCMC, Ltd. According to the deposition testimony of defendant Norick, SCMC, Ltd. was formed to buy all the stock of SCMC Corp. This complex holding arrangement was designed to circumvent state law forbidding a cemetery corporation from paying dividends [1] by laundering the corporate profits through the partnership so they could be distributed as partnership profits to its partners. And of course, one partner, Norsim, Inc., could, if its directors chose, distribute its share of the partnership profits in the form of dividends to its stockholders.

On March 5, 1968 an agreement was executed by the partners, stockholders, partnership, and corporation turning the entire cemetery operation over to defendant Simpson. This agreement provided, among other things, that (1) defendant Norick convey his Norsim, Inc. stock to defendant Simpson and (2) Norick and the other individual partners of SCMC, Ltd. and stockholders of SCMC Corp. convey their interests in both to Norsim, Inc. The intended objective of these maneuvers was to vest all Norsim, Inc. stock in Simpson, who through it would own all of SCMC, Ltd. and SCMC Corp. stock. On his part defendant Simpson agreed to hold harmless all other guarantors of the SCMC, Ltd. note.

Sometime later another corporation evidently came into being called "SCMC, Inc." because Simpson pleaded that on July 1,

1. Title 8 O.S.1971 § 8.

1973 he entered into a written contract with it and Walter Bowers, whereby Simpson sold his stock in SCMC Corp. to SCMC, Inc. and SCMC, Inc. assumed the note in question as well as Simpson's guaranty. Apparently, SCMC, Inc. was a new corporate entity formed by a Donald C. Fuller, its president, to buy the cemetery operation from defendant Simpson.

On July 1, 1974, an amendment to the July 1, 1973 contract was made which reads in part as follows:

"WHEREAS, under the terms of the Contract [of July 1, 1973], SCMC [Inc.] had assumed the guarantee of Simpson to State Capitol Bank . . . on a Spring Creek Memorial Cemetery Corporation [SCMC, Ltd.?] . . . note, which assumption of guarantee State Capitol has not acknowledged or recognized; and

"WHEREAS, SCMC [Inc.] wishes to modify and renegotiate the terms of said Spring Creek note to State Capitol; and

"WHEREAS, Simpson is agreeable to continuing, so far as State Capitol is concerned, as guarantor on said modified and renegotiated note;

"NOW, THEREFORE . . . . .

. . . . . .

"3. Simpson agrees to remain as guarantor on the note of Spring Creek to State Capitol, as renegotiated by SCMC [Inc.] and State Capitol.

"4. SCMC [Inc.] confirms its assumption of Simpson's guarantee on the aforementioned note of Spring Creek to State Capitol, as amended and renegotiated, and confirms its obligation to Simpson to hold him harmless from liability thereon."

This amendment was signed by John M. Merritt, the new president of SCMC, Inc. and Leo Garwin, attorney-in-fact for defendant Simpson. According to the testimony of Bill Eddy, vice president and loan officer of plaintiff bank, both Fuller and Merritt contacted him requesting that he "transfer" subject note to the new corporate entity called SCMC, Inc., allow it to assume the debt and "modify the payment terms." The banker refused to do so.

II

The last payment on the note was made on October 11, 1973. Thereafter repeated efforts to obtain payment failed, and, finally, on January 17, 1975, this action was commenced seeking judgment against Simpson and Norick for a $23,577.20 balance due and owing on the note with interest accruing at the rate of $6.32 per day.

Defendant Norick filed a cross-action against Simpson asking for judgment under the hold harmless provisions of the 1968 agreement. Later on Norick answered bank's petition with a general denial and alleged that: (1) the acts and conduct of plaintiff have exonerated defendant of any obligation with respect to the guaranty; (2) there has been a failure of consideration; and (3) plaintiff acquiesced in and ratified the agreement of March 5, 1968, thereby effecting a novation of the loan guaranty agreement and excusing defendant from his obligation.

Plaintiff replied, denying all three allegations, including any knowledge of the March 5, 1968 agreement.

Defendant Simpson denied Norick's cross-allegations and by an answer verified by his attorney, denied all of plaintiff's allegations and stated that plaintiff's conduct had exonerated defendant of any liability with respect to his guaranty and that there has been a failure of consideration. Coupled with his answer was defendant Simpson's cross-petition for judgment against SCMC, Inc., under its guaranty assumption contract of July 1, 1973.

III

Both plaintiff and defendant Norick moved for summary judgment. Following a hearing of these motions on October 26, 1975, the trial court found "that the

Guaranty Agreements executed by . . . Norick and Simpson . . . guaranteed only the payment of the first $46,250.00 of the note of Spring Creek Memorial Cemetery, Ltd., which was in the original principal sum of $70,000.00; that such note has a balance due of $23,577.20, showing that in excess of $46,250.00 has been paid on such note, and therefore such Guaranty Agreements have been fully performed and are of no further force and effect; that there is no substantial controversy as to any material fact, and that the Defendants Norick and Simpson are entitled to judgment as a matter of law."

Bank advances three propositions, the first two of which are aimed at reversing the summary adjudication, while the last one seeks a summary judgment in its own favor.

### IV

■ The central question to be resolved is whether defendants' $46,250 guaranty was intended to assure full payment of the $70,000 note, or only the first 66 percent of it. The trial judge, as we noted earlier, found the assurance to be the latter. Bank insists here this conclusion is wrong for at least two reasons: (1) the guaranties executed by defendants, while limited in amount, created obligations continuing in nature; and (2) even if they were not continuing, the obligations were not to be discharged until the note was paid in full.

The first point we agree with but consider it irrelevant in resolving the pivotal issue here because it is made material neither by the facts nor the law. A "continuing guaranty" relates to or is concerned mainly with a "future liability of the principal, under successive transactions," or the renewal of a once satisfied liability.

15 O.S.1971 § 336. Here it is pretty clear that the only debt, transaction or liability the parties had in mind when the guaranties were executed was the $70,000 note. And, so far as subsequent events are concerned, the facts involve no other liability or transaction to which the continuing guaranty concept can apply.

### V

The bank's second proposition approaches the problem from the standpoint of a single debt situation and argues persuasively that absent an express agreement controlling the application of payments on subject note, the first payments will be considered as satisfying the nonguaranteed portion of the loan by operation of law, citing *Dunlap v. Stannard,* 19 Okl. 232, 91 P. 845 (1907). This appears to be the rule followed also by other jurisdictions.[2]

Defendants' responses to this and the defense of their judgment are twofold: (a) 15 O.S.1971 § 341[3] specifies that payments on the principal obligation operate to "reduce pro tanto the obligations of a guarantor thereof," and (b) there is evidence in the record indicating the bank "substituted" primary obligors on the note in question without the consent of Norick so that the latter's commitment is exonerated.

### VI

With regard to the last point we find no evidence supporting such a conclusion, much less evidence that is undisputed. Norick relies on the fact that the bank's liability ledger identified SCMC, Corp. as the debtor, rather than SCMC, Ltd., and that a bank official testified that the name placed on the ledger is supposed to be the name of the debtor to whom the bank is looking for payment. However, the

2. *Walton v. Washington County Hospital Ass'n,* 178 Md. 446, 13 A.2d 627, 128 A.L.R. 970 (1940); *Cooper Grocery Co. v. Strange,* Tex.Com.App., 18 S.W.2d 609 (1929); *Washington Grocery Co. v. Citizens' Bank,* 132 Wash. 244, 231 P. 780 (1925).

3. Section 341 reads:
"The acceptance, by a creditor, of anything in partial satisfaction of an obligation, reduces the obligation of a guarantor thereof, in the same measure as that of a principal, but does not otherwise affect it."

banker also testified the ledger caption was incorrect and that the bank had never stopped looking to the original promisor for repayment of the loan. There is no evidence in the record suggesting otherwise, nor has Norick indicated how his rights might have been offended by the bank error. All one can say for Norick's substitution theory at this point is that at most it may possess the potential of raising a factual issue should evidence contradicting the bank official's testimony be adduced.

## VII

We return now to the first point raised —one also sponsored by Simpson—regarding the import of § 341. In discussing it we will assume defendants use the term *pro tanto* as meaning "to the extent of" or "equal to." *Fidelity Sav. Bank v. Wormhoudt Lumber Co.,* 251 Iowa 1121, 104 N.W.2d 462 (1960). So the argument becomes this: the bank's acceptance of partial payments on the installment note in the amount of $49,025.81 "reduces the obligation of a guarantor thereof, in the same measure as that of a principal," that is, in an amount equal to that paid. Therefore, defendants conclude, since the principal obligation has been reduced in an amount exceeding defendants' guaranty limits, their liability is discharged.

Section 341, like other guaranty statutes contained in Chapter 8 of Title 15, is an old one borrowed from the 1887 compiled Laws of Dakota in 1890, while the land area now called Oklahoma was yet a territory. The enactment has been construed in but one case, so far as we can find, and that case does not deal with an issue remotely related to the one we have here.[4] Neither the precise meaning nor the purpose of § 341 is entirely clear. It would seem self-evident that in regard to a particular guaranteed debt the reduction of the principal would operate to reduce the guarantor's obligation to the same ex-tent or pro tanto. Perhaps the use of the word "anything" provides a clue to the underlying thrust of the section. If, for example, the principal obligee of a $500 note accepted a cow and a hog from a Dakota farmer debtor before the turn of the century in return for $100 credit on the note, then the guarantor, absent an agreement to the contrary, was discharged to the extent of $100 even if the animals were worth less or died a week later.

Plainly § 341 addresses itself to a basic contract of guaranty regarding an existing obligation uncomplicated by conditions such as those dealing with amount or time limitations or with terms enlarging its scope to future transactions. For this reason the section cannot be construed to require a "pro tanto," or dollar for dollar, reduction of the guarantors' liability in this case. Certainly if it might otherwise apply, it would require no more than a pro rata reduction of the secondary promisor's obligation, that is for every dollar paid on the principal, defendants' guaranty limit (roughly two-thirds of the principal amount) would be reduced 66⅔ cents.

But whether or not this be the correct construction of § 341, the parties can agree otherwise. And we think they did in this case. Quite clearly and unambiguously defendants requested the bank to make the $70,000 loan to SCMC, Ltd. and agreed to "guarantee the full payment" of the obligation at maturity "to the extent of" $46,250. That is, defendants said, in effect, we will see to it that you, bank, get paid in full so long as we do not have to pay more than $46,250. There is nothing in the bank's broad guaranty form signed by defendants that suggests the guaranty liability is limited other than in amount. It is not limited, for instance, as to duration—a limit we therefore cannot judicially write into the agreement. Similarly, the liability is not restricted to the front part of the note or, more spe-

4. *Walker v. McNeal,* 132 Okl. 40, 269 P. 295 (1928).

cifically, to the first $46,250 due, payable, or paid on it. This, in effect, is what defendants say we should hold the contract prescribes. But to do so in our judgment, would run counter not only to the terms of the agreement but to the provisions of § 341.[5]

We hold that defendants guaranteed "full" payment of the SCMC, Ltd. note with but one limitation, viz., their liability would not exceed $46,250. If other limitations or restrictions on their guaranty obligation defendants had in mind, they could not become effective without inclusion in the written pact.

5. As we mentioned earlier, we think a fair construction of § 341, if indeed it is applicable to a case of limited liability, would require that a payment on the principal operate as a pro rata reduction of the guaranty. For example, if the guaranty limit is roughly two-thirds of the principal, application

## VIII

Bank's other contention—that we should grant it a summary judgment—has been withdrawn as against defendant Simpson.[6] And from what we have said earlier about the issues raised by defendant Norick, a summary judgment against him is not warranted.

## IX

The pretrial judgment entered on October 26, 1975 is reversed and the cause is remanded for further proceedings.

BACON, P. J., and NEPTUNE, J., concur.

of a pro rata reducing formula would result in a two-thirds reduction of the guarantor's liability.

6. Page 4 of bank's brief replying to Simpson's brief.