DON L. TULLIS & ASSOCIATES,
INC., Respondent,

v.

Vance K. GOVER et al., Appellants.

No. 10555.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 18, 1979.

As Modified on Court's Own Motion
Feb. 9, 1979.

Motion for Rehearing or to Transfer
Denied Feb. 20, 1979.

Application to Transfer Denied
April 10, 1979.

892

Tom B. Kretsinger, Warren H. Sapp, Kansas City, pro se and for appellants.

Gary R. Cunningham, Francis H. McClernon, Jr., Daniel, Clampett, Rittershouse, Dalton & Chaney, Springfield, for respondent.

Before FLANIGAN, P. J., TITUS, J., MOORE, KENNEDY and CAMPBELL, Special Judges.

FLANIGAN, Presiding Judge.

Plaintiff Don L. Tullis and Associates, Inc., a corporation, brought this action against defendants M. F. Rippey, W. H. Tate, Kenneth E. Johnston, Vance K. Gover, Tom B. Kretsinger, and Warren H. Sapp. The petition contained eight counts and named additional defendants which included Refrigerated Food Line, Inc. ("Refrigerated"). Prior to the trial, judgment in favor of plaintiff and against Refrigerated was entered, by stipulation, on Counts I and VII. Plaintiff dismissed all other counts of the petition except Count VI which was against the six defendants first listed and the cause proceeded to trial on Count VI.

Count VI was based on obligations allegedly incurred by the six defendants emanating from a document entitled "Guaranty," Exhibit 2, which is set out marginally.[1] The trial court, sitting without a jury, found the issues on Count VI in favor of the plaintiff and awarded judgment in the sum of $10,000 together with interest and costs. The six defendants appeal.

Defendants' brief contains seven "points relied on." Each point advances an independent reason why plaintiff should have been denied any relief on Count VI.

■ In the trial court defendants filed a motion for new trial which included some, but not all, of the seven appellate assignments of error. Plaintiff argues that the assignments which were omitted from the motion have not been preserved for review. Plaintiff's position is incorrect. In a case tried without a jury, a motion for new trial is not necessary "to preserve any matter for appellate review," Rule 73.01 par. (2)(b),[2] and if a motion for new trial is filed, the fact that it may be imperfect does not prejudice the appellant's position on appeal. *Coale v. Rickard*, 540 S.W.2d 151, 152[1] (Mo.App.1976); *South Side Plumbing Company v. Tigges*, 525 S.W.2d 583, 586[1] (Mo. App.1975).

■ Appellate review is limited to those issues presented in defendants' points, *Pruellage v. DeSeaton Corporation*, 380 S.W.2d 403, 405[3] (Mo.1964); *Brewer v. Blanton*, 555 S.W.2d 381, 383[1] (Mo.App. 1977); and this opinion should be so viewed.

Summarizing the germane evidence has been difficult because portions of the record are vague and disorganized. The facts underlying the instant action had their beginning in 1971. Refrigerated, a corporation, was a motor carrier whose operations were subject to regulation by the Interstate

---

1. Exhibit 2:

**"Guaranty**

KNOW ALL MEN BY THESE PRESENTS:

That on this 1st day of April, 1971, the undersigned hereby guaranty a loan made to Refrigerated Food Line, Inc. of Springfield, Missouri, by The State Bank of Arlington, Jacksonville, Florida, in the amount shown in a premium contract entered into by and between Refrigerated Food Line, Inc. and The State Bank of Arlington, Jacksonville, Florida, on the _____ day of _____, 1971, a copy of which is attached hereto as Appendix A.

It is understood that on the payment of $10,000.00 said guarantors shall be released from any liability under this guaranty.

Guarantors specifically limit their individual liability in the following percentages.

| | Percentage of loan |
|---|---|
| M. G. Rippey | 20 |
| W. H. Tate | 20 |
| Kenneth E. Johnston | 20 |
| Vance K. Gover | 20 |
| Tom B. Kretsinger | 10 |
| Warren H. Sapp | 10 |

The terms of this guaranty and any waivers of guarantors shall be the same as those contained in the premium contract between Refrigerated Food Line, Inc. and The State Bank of Arlington, Jacksonville, Florida, attached hereto.

/s/ M. G. Rippey /s/ W. H. Tate
/s/ Kenneth E. Johnston /s/ Vance K. Gover
/s/ Tom B. Kretsinger /s/ Warren H. Sapp"

2. Unless otherwise indicated, all references to rules are to Missouri Rules of Court, V.A.M.R., and all references to statutes are to RSMo 1969, V.A.M.S.

Commerce Commission. Refrigerated was required to carry liability insurance. Its financial condition in that year was not good and it ceased operations in July.

The six defendants are shareholders of Refrigerated. Rippey, Tate, Johnston, and Gover each owned 20 percent of the stock in Refrigerated and Kretsinger and Sapp each owned 10 percent. Rippey is the president of Refrigerated and a member of its board. Some (and probably all) of the other five defendants are also directors. Kretsinger and Sapp are lawyers.

By reason of prior dealings between plaintiff and Refrigerated, the latter, in early 1971, owed plaintiff approximately $18,000. If Refrigerated was forced to cease operations because it could not obtain the required insurance, plaintiff's prospects for collecting that debt were dim.

Plaintiff, a Florida corporation, operated an insurance agency. Don L. Tullis is the president of plaintiff. Another insurance firm in the picture was the Springfield, Missouri firm of Nixon, Shipp and Roderick. For present purposes this firm may be regarded as one person and will be referred to as "Nixon."

In order to continue its business operations it was necessary for Refrigerated to obtain three policies of insurance, each having a policy period commencing March 8, 1971. Two of the policies (providing, respectively, liability insurance and cargo insurance) were being handled through Nixon and the latter received compensation therefor as the selling agent. The third policy (providing "umbrella" insurance) was handled by plaintiff and it was entitled to receive the commission generated by the sale of that policy.

The three policies required a total premium of $71,012. Refrigerated was able to make, and did make, a cash down payment of $6,012. It was necessary to obtain financing for the $65,000 balance. Nixon was unable to arrange that financing. Refrigerated (and the six defendants) requested plaintiff to arrange it.

Pursuant to the foregoing request, Tullis (acting for plaintiff) on some date or dates shortly prior to March 11, 1971, had a series of conversations with Rippey. Tullis also "met with the board" of Refrigerated "several months" prior to March 1971. The "insurance problems" of Refrigerated were discussed. Acting at the request of the defendants, Tullis negotiated with a bank (State Bank of Arlington) located in Jacksonville, Florida. Those negotiations culminated in the execution of a document entitled "premium contract." That document will be referred to as "Appendix A" for the reason that it is so denominated in the guaranty, Exhibit 2, set forth in footnote 1.

On March 11, 1971, Refrigerated (acting through its president Rippey and its secretary Gover) and the bank executed Appendix A. That document identified the three policies and listed their respective premiums. It recited that the bank had paid $65,000 to the respective insurance companies. Among the provisions of Appendix A were the following:

1. A promissory note was to be executed by Refrigerated in favor of the bank calling for the payment of the $65,000 (plus certain finance charges) in nine equal monthly installments, the first commencing April 10, 1971. This note, so executed, was incorporated in Appendix A.

2. As security for the payment of the note, Refrigerated assigned to the bank all "unearned or returned premiums at any time payable on said policies."

3. In the event of nonpayment of any installment when due, the bank had the option of declaring, without notice, the entire balance due and the bank was given the right to cancel the policies and receive all returned or unearned premiums for application to the indebtedness. Refrigerated would deliver the policies to the bank for that purpose.

4. Refrigerated appointed the bank its attorney in fact to cancel the policies and to receive the unearned or returned premiums.

The reverse side of Appendix A contained a guaranty agreement whereby plaintiff and Nixon guaranteed the prompt payment to the bank of all monies due it from Refrigerated under the note.

It was not uncommon for plaintiff to arrange for the financing of insurance premiums in the manner accomplished by Appendix A. When doing so plaintiff usually required from its customer (the insured) a down payment of 20 percent or 25 percent of the policy premium. Such a payment (coupled with the anticipated refund of each unearned premium) would adequately protect plaintiff from loss to which plaintiff would be exposed by reason of its acting as a guarantor of the loan which the bank would make to the insured.

For the instant three policies plaintiff, customarily, would have required a cash down payment in the neighborhood of $16,-000. Refrigerated, however, could make a cash down payment of only $6,012. Thus other arrangements had to be made. All these factors were known by defendants prior to March 8, 1971, the inception date of the three policies.

Prior to the execution of Appendix A there was an understanding between plaintiff and the six defendants that the latter would furnish plaintiff with some type of guaranty whereby the defendants would indemnify plaintiff for any loss plaintiff incurred in its role as a guarantor of Appendix A. Plaintiff felt that if such a guaranty had a collectible amount of $10,000 it would provide a sufficient "cushion" for plaintiff's exposure. That cushion would be a sufficient inducement for plaintiff to make the appropriate arrangements with the bank. Appendix A was the product of those arrangements.

On March 11, 1971, after Appendix A had been executed, plaintiff sent Refrigerated a document, not in evidence, for execution by the six defendants. The document plaintiff sent Refrigerated was not signed by any of the six defendants. Instead the six defendants signed Exhibit 2 and sent it to plaintiff.[3] At least a portion of Exhibit 2 was drafted by defendants "Kretsinger and/or Sapp."

Upon receiving Exhibit 2 plaintiff, according to president Tullis, felt that "it appeared to be adequate." Tullis telephoned Rippey, discussed Exhibit 2 with him and, in essence, accepted Exhibit 2. Plaintiff was then in possession of the insurance policies and plaintiff, satisfied with Exhibit 2, "allowed Appendix A to remain in force." *Defendants* introduced evidence to the effect that if Exhibit 2 had been unacceptable to plaintiff, plaintiff could have cancelled the policies and obtained the refund of unearned premiums.

Refrigerated made the first three monthly payments to the bank but, in the summer of 1971, defaulted on the fourth payment. Refrigerated went out of business at that time and Nixon and plaintiff took the steps necessary to cancel the three insurance policies.

Refrigerated's initial obligation to the bank, under the note, amounted to $65,000 plus interest, so that the total amount due was $67,787.15. The following table reflects payments on the note which were derived from sources other than the plaintiff:

[See following illustration.]

---

3. Although Exhibit 2, set forth in footnote 1, is dated April 1, 1971, actually it was signed by the defendants prior to that date. This is demonstrated by the fact that plaintiff received Exhibit 2 from defendants on March 24, 1971.

| | | |
|---|---:|---:|
| Original amount due on note | | $67,787.15 |
| Payments on note: | | |
| Payments made by Refrigerated (three monthly installments) | | 20,336.13 |
| Refund received in 1971 on policy written by plaintiff | 4,219.00 | |
| Refund received in 1971 on policies written by Nixon | 20,887.00 | |
| Refund received in 1976 on policies written by Nixon | 12,705.00 [4] | |
| Total refunds of unearned premiums | | 37,311.00 |
| Total payments | | 58,147.13 |
| Balance due to bank on Appendix A | | $10,140.02 |

In late December 1971 plaintiff made a written demand upon the six defendants that they fulfill their respective obligations under Exhibit 2 and make the appropriate payment to the bank. None of the six defendants made payment, plaintiff did so, and this action was instituted.

 Defendants' first point is that plaintiff was not entitled to relief because plaintiff has been "fully reimbursed," in fact overpaid, for funds paid by plaintiff to the bank in accordance with plaintiff's duty as guarantor under Appendix A. A sufficient answer to this point is that it is factually unfounded.[5] Defendants' first point has no merit.

Defendants' second point is that Exhibit 2 was unenforceable because it was not supported by "a valid consideration" or by "adequate consideration."

 Although a contract of guaranty requires consideration, *Ireland v. Shukert*, 238 Mo.App. 78, 177 S.W.2d 10, 14[5] (1944) it is not necessary that the guarantor derive any benefit from either the principal contract or the guaranty. *DeLassus v. Russell*, 296 S.W. 225, 227[1–2] (Mo.App.1927). A benefit to a third person, or a detriment to a promisee (the guarantee) or a change in the promisee's relations in consequence of the promise is sufficient consideration to render the promisor obligated. *Industrial Bank & Trust Co. v. Hesselberg*, 195 S.W.2d 470, 474[10] (Mo.1946). If the guaranty is executed subsequent to the principal contract, it requires a new and independent consideration. *J. R. Watkins Company v. Smith*, 31 S.W.2d 544, 546[3] (Mo.App.1930).

In the argument under their second point defendants state: "Neither plaintiff nor the bank gave any *new* consideration or suffered any *new* detriment in exchange for receiving the guaranty agreement." Defendants do not argue that the making of the loan by the bank or the execution by the plaintiff of its guaranty, singly or in combination, would not constitute adequate consideration so long as their accomplishment was timely with respect to the execution by defendants of Exhibit 2. On the other hand, what defendants do stress is the fact that those actions, by the bank and plaintiff respectively, were accomplished on March 11, 1971, and that defendants did not sign Exhibit 2 until several days later.

The record does not show on what date defendants signed Exhibit 2. The docu-

---

4. Nixon was named as a defendant in another count of the petition. On the morning of the trial in 1976 Nixon made a settlement with the plaintiff and the count against Nixon was dismissed. Actually Nixon had received the refund in 1971 but since the settlement was made in 1976 plaintiff credited that payment on the note at that time. Plaintiff thereupon reduced the ad damnum clause of Count VI against the instant six defendants to $10,140.02.

5. Defendants seek to benefit twice from a single payment. The payments on the note, set forth earlier in the opinion, were itemized in plaintiff's Exhibit 3. The amount which Nixon paid plaintiff in 1976, mentioned in footnote 4, was included in Exhibit 3. Defendants' computations take credit for the payments included in Exhibit 3 but erroneously take credit again for the amount of the Nixon settlement.

ment itself bears the date April 1, 1971.[6] However, it was signed prior to April 1, 1971, because the defendants signed it in Missouri and it was thereafter mailed to plaintiff in Florida and plaintiff received it on March 24, 1971. The record does not show when Exhibit 2 was deposited in the mail nor how long it was in the custody of the postal service. The record does demonstrate, however, that the bank would not have made the loan without the guaranty of plaintiff and that plaintiff signed its guaranty in reliance upon defendants' prior promise to execute a guaranty.

■ Under the foregoing circumstances the execution by defendants of Exhibit 2 may be considered to have been contemporaneous with the making of the loan by the bank and the execution by plaintiff of its guaranty. *Centennial State Bank v. S.E.K. Const. Co., Inc.,* 518 S.W.2d 143, 150[9] (Mo. App.1974). In that case a guaranty under a promissory note was given ten days after the note was executed. The court held that the consideration for the guaranty was the making of the loan evidenced by the note and that under the circumstances the guaranty "can be said to be contemporaneous with the execution" of the note, "even though not given on the same day."

In addition, the following language is found in 38 Am.Jur.2d Guaranty § 45, p. 1048:

"Although the guaranty promise may have been made at a time subsequent to the creation of the principal obligation, the guaranty promise is founded upon a consideration if the promise was given as the result of previous arrangement, the principal obligation having been induced by or created on the faith of the guaranty." See also 167 A.L.R. 1174, at 1203.

Defendants' second point has no merit.

Defendant's third point is that Exhibit 2 was unenforceable because defendants did not receive notice of plaintiff's acceptance of it.

As previously stated, after plaintiff had received Exhibit 2 from defendants, plain-

tiff's president Tullis had a telephone conversation with defendant Rippey in which Exhibit 2 was discussed and Tullis, for plaintiff, in essence accepted Exhibit 2. Defendants make no claim that Rippey did not have authority to receive that information or that he did not relay it to the other five defendants. The adequacy of that notice of acceptance need not be determined for the reason that under the circumstances no notice to defendants of plaintiff's acceptance of the guaranty was required.

■ Where the instrument of guaranty is executed contemporaneously with the creation of the principal obligation, notice of acceptance need not be shown. "The guarantor, in such cases, knows precisely what he guarantees, and the extent of his responsibility; and any further notice to him would be useless." 38 Am.Jur.2d Guaranty § 98, p. 1105.

■ At the time defendants executed Exhibit 2, they were fully aware of their obligations in case of Refrigerated's non-performance of Appendix A for the obvious reason that Appendix A was an attachment to Exhibit 2. "[W]here a party directly binds himself to be responsible for the fulfillment of another's contract *already made,* no such notice can be necessary. . . . Of what was the guarantor to be notified? The agreement between the two parties to the contract, the performance of which on one side is guaranteed, is before the guarantor when he signs his obligation to be responsible, and is referred to in his guarantee. He knows exactly the extent of his responsibility, just as well as the party who asks the security. Whether either party to the original contract will comply with his engagements is in the future, but what the responsibility of the guarantor will be in either event is a matter fixed and certain. There was no question of notice or acceptance in this case." (Emphasis added.) *Davis Sewing Machine Co. v. Jones,* 61 Mo. 409, 411 (1875). See also *Linro Medicine Co. v. Moon,* 190 Mo.App. 366, 177 S.W. 322, 323[2] (1915); *Texas Company v. Stanberry,* 165 S.W.2d 696, 700 (Mo.App.1942); *Ireland*

6. The first installment on Refrigerated's note, contained in Appendix A, was payable April 10, 1971.

*v. Shukert*, 238 Mo.App. 78, 177 S.W.2d 10, 16[11] (1943); Anno. 6 A.L.R.3d 355, 383.

In addition, there is no requirement that the guarantor be given notice of the acceptance of the guaranty by the guarantee where the guaranty is given in response to a request for it by the guarantee. *N. O. Nelson Mfg. Co. v. Shreve*, 94 Mo.App. 518, 68 S.W. 376, 377[1] (1902); *Miner v. Bennett*, 556 S.W.2d 692, 695[4] (Mo.App.1977); Anno. 6 A.L.R.3d 355, 400.

Defendants' third point has no merit.

Defendants' forth point is that they were discharged from their obligations under the guaranty for the reason that Refrigerated, under Appendix A, paid more than $10,000 to the bank on the loan. Defendants rely upon that portion of Exhibit 2 which reads: "It is understood that on the payment of $10,000 said guarantors shall be released from any liability under this guaranty."

"[T]he plain language of a contract of guaranty (as the plain language of other contracts) is considered with a view of discovering and giving effect to the intention of the parties. When the language expressing the terms and provisions of a contract of guaranty is of doubtful meaning, the same rules of the construction are to be applied as are applied in the construction of other written instruments of doubtful meaning. . . . In construing a contract of doubtful meaning, the court must give such construction as will be fair and reasonable between the parties; the ordinary meaning of the language used must be given effect, and the intention of the parties gathered from a consideration of all of the provisions of the instrument. . . . '[T]he court may consider the relationship of the parties, the subject matter of the contract, the usages of the business, the surrounding facts and circumstances attending the execution of the contract and its interpretation by the parties'." *Industrial Bank & Trust Co. v. Hesselberg*, 195 S.W.2d 470, 476 (Mo.1946). See also *McIntyre v. McIntyre*, 377 S.W.2d 421, 425[4, 5] (Mo.1964).

Defendants seek to derive benefit from payments made by Refrigerated and not by defendants, from payments made under Appendix A and not under Exhibit 2, from payments made to the bank and not to plaintiff. It is true that Refrigerated, in paying the first three installments on the note, paid more than $10,000. That fact, however, did not relieve defendants of their obligations under the guaranty.

Exhibit 2, manifestly, is not a model of draftsmanship. Whether all of Exhibit 2 was drafted by defendants-lawyers "Sapp and/or Kretsinger" is not shown but the record does reflect that the paragraph containing the $10,000 limitation and the following paragraph containing the limitations on the guarantor's "individual liability" were drafted by one or both of those defendants.

If the parties intended that the payment of $10,000 or more by Refrigerated to the bank would operate to discharge the defendants, that intention could have been stated simply. Examination of what Exhibit 2 does state shows the invalidity of defendants' fourth point.

The opening paragraph of Exhibit 2 states that the defendants "hereby guarantee *a loan* made to [Refrigerated] by [the bank] in the amount shown in . . . Appendix A." The debt being guaranteed was the loan ($65,000 plus finance charges), not the first $10,000 of the loan. The paragraph containing the $10,000 limitation was inserted by defendants-lawyers. The only parties mentioned in that paragraph are "said guarantors." The trial court properly construed that paragraph to mean that the $10,000 payment mentioned in it was to come from them and was to be a payment under the guaranty itself. See *State Capitol Bank of Oklahoma City v. Norick*, 550 P.2d 587, 591[2, 3] (Okl.App.1976) where the court was confronted with a somewhat similar situation and reached the same conclusion.

The circumstances leading up to the execution of Appendix A and Exhibit 2 are consistent with this court's holding that the $10,000 payment mentioned in Exhibit 2

refers to a payment by the guarantors under the guaranty and does not refer to the first $10,000 to be paid by Refrigerated under Appendix A. Exhibit 2 was executed to provide plaintiff with a "cushion" substantially similar to a cash down payment. Plaintiff's protection from its exposure on its guaranty would be provided by such a down payment coupled with the unearned premium to be refunded in the event of policy cancellation. The cancellation of some of the policies required a 30-day notice. The down payment (or Exhibit 2 in substitute therefor) was intended to protect plaintiff in light of the fact that during the 30-day cancellation period the policy would remain in effect and the premium for that period would be earned and not be refunded. Moreover, the amount of premiums refunded might be less than the balance due on the note. Plaintiff's need for this additional protection lasted throughout the term of the bank's loan to Refrigerated. This need did not come to an end merely because Refrigerated made payment of $10,000 to the bank.

Defendants' fourth point has no merit.

■ Defendants' fifth point is that the trial court erred "in concluding that defendants' liability was joint and several, and in failing to conclude that any liability was several only, under the specific terms of the guaranty." This point falls short of complying with Rule 84.04 which requires that a point "state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous."

Defendants' argument under Point V is also uninformative. The argument does point to that portion of Exhibit 2 which reads as follows:

"Guarantors specifically limit their individual liability in the following percentages.

| | Percentage of loan |
|---|---|
| M. G. Rippey | 20 |
| W. H. Tate | 20 |
| Kenneth E. Johnston | 20 |
| Vance K. Gover | 20 |
| Tom B. Kretsinger | 10 |
| Warren H. Sapp | 10" |

Defendants then say that if this court concludes that "defendants have incurred some liability," this court "must modify the judgment to make any such liability several."

Defendants' brief does not point out the significance, if any, of the claimed error. It may be that defendants are arguing that defendant Rippey, for example, should not have been held liable to the plaintiff in the sum of $10,000 but that his liability should have been limited to 20 percent of that sum, and the same would be applicable to defendants Tate, Johnston, and Gover. Similarly the liability of Kretsinger would be limited to $1,000 (10 percent of $10,000) and so would that of defendant Sapp.

On the other hand it may be that defendants are arguing that the quoted portion of Exhibit 2, although of no aid to four of the defendants (Rippey, Tate, Johnston and Gover) under the instant facts, renders the judgment excessive with respect to the liability of Kretsinger and that of Sapp because the limitation of "10 percent of loan" applicable to the latter two defendants comes into play.

Defendants (perhaps understandably) make no effort to provide this court with their construction of the quoted portion. They content themselves with saying the trial court was wrong but fail to add "wherein and why."

It will be observed that the quoted portion limits the "individual liability" of the guarantors to "20 percent *of loan*" with respect to four of the defendants and "10 percent *of loan*" with respect to Kretsinger and Sapp. As stated previously, this provision was drafted by "Kretsinger and/or Sapp."

It is clear that the limitation is to be computed on the basis of "percentage of loan." The amount of the loan, as set forth in Appendix A, is at least $65,000 and if the finance charges are included, the amount is even larger. Twenty percent of $65,000 is $13,000. The judgment was in the amount of $10,000. It follows that four of the defendants would not benefit from the limitation even if it be assumed that they were entitled to it so far as their liability to

plaintiff is concerned. On the other hand Sapp and Kretsinger may be asserting that the 10 percent limitation entitles each of them to relief from the judgment insofar as it exceeds $6,500.

Whether a given contract binds two (or more) promisors severally, jointly, or jointly and severally, is determined by a body of rules set forth in *Illinois Fuel Co. v. Mobile & O. R. Co.*, 319 Mo. 899, 8 S.W.2d 834, 840[5–7] (Mo.1928). Those rules were enumerated in light of § 431.110 which reads, "All contracts which, by the common law, are joint only, shall be construed to be joint and several."

▮▮▮▮ The rules set forth in *Illinois Fuel* include the following:

1. Under the common law, where two or more persons undertake the performance of an obligation, the presumption is that the undertaking was joint. Words of express joinder are not necessary for this purpose. Words of severance are required to produce a several responsibility, and in the absence of such words the undertaking is joint and not several.

2. A joint contract is one by which two or more promisors are jointly bound to fulfill its obligations, and either of whom may be charged with the entire liability under the contract.

3. Whether the promises are several or joint, or joint and several, depends on the construction of the language used, and the intention of the parties as manifested by the language must be followed by the court.

4. An obligation undertaken by two is presumably joint, in the absence of express words to render it joint and several, or a statute declaring every contract, though joint in its terms, to be several as well as joint.

▮▮▮▮ The court held, in *Illinois Fuel*, that the liability of two railroad companies under a contract was joint and several where the contract read: "The railroad companies hereby purchase . . . The railroad companies agree to remit . . . ." The

court pointed out that the contract expressed a joint obligation and that it contained no express words of severance. Under *Illinois Fuel*, the contract of defendants, as expressed in the opening paragraph of Exhibit 2, was joint and several.[7]

If Exhibit 2 did not contain the quoted portion, defendants' obligations would be joint and several. The inquiry is, does the quoted portion change that result.

The quoted portion uses the expression, "their individual liability," and it is at least arguable that that language means that the liability imposed in the prior paragraphs was something other than "individual," to-wit, joint and several. This construction gains force when the quoted portion is scrutinized. With respect to Rippey, for example, it imposed a limitation on his "individual liability" amounting to "20 percent of loan." That limitation translates into $13,-000. If that limitation were to be applicable to Rippey's exposure to the plaintiff, it would be meaningless because the prior paragraph of Exhibit 2, containing the $10,-000 limitation for *collective* liability, was more favorable to Rippey than a $13,000 limitation on his *individual* liability.

On the other hand, the scriveners of the quoted portion, Kretsinger and/or Sapp, could benefit from the limitation of 10 percent of the loan, a limitation of $6,500. It follows that the quoted portion was inserted solely for the benefit of Kretsinger and Sapp. Each of them owned 10 percent of the stock of Refrigerated and each of the other four defendants owned 20 percent. It is clear that the purpose of the quoted portion was to provide for contribution, *among the six defendants*, based upon their respective stockholdings.

As might be expected, in view of the peculiar nature of Exhibit 2, factual precedents are unlikely to be encountered. However a case which is consistent with the foregoing analysis and holding is *Wisconsin Marine & Fire Ins. Co. Bank v. Wilkin*, 95 Wis. 111, 69 N.W. 354 (1896).

7. See *Irwin v. Rawling*, 141 S.W.2d 223, 225[3] (Mo.App.1940) where a warranty of attorney authorizing confession of judgment against

"the undersigned" was held to impose "joint and several" liability on the two signers.

Defendants' fifth point has no merit.

Defendants' sixth point is that plaintiff was not entitled to relief because defendants invoked §§ 433.010 through 433.030 and plaintiff failed to act accordingly.

Those statutes, considered together, permit "a *surety* for another in any bond, bill or note," at any time after "an action has accrued thereon" to require, in writing, the person having such right of action forthwith to commence suit against the principal debtor and other parties liable. The method of serving the notice is prescribed. If the action is not commenced within 30 days after the service of the notice, "and proceeded in with due diligence, in the ordinary course of law, to judgment and execution" such *surety* shall be exonerated from liability to the person so notified.

The fact is that the six defendants did not take the necessary steps to invoke the three statutes, but the particulars of their deficiency need not be described because the statutes are inapplicable in any event. These statutes may be invoked by a *surety* and may not be invoked by a *guarantor. Martinsburg Bank v. Bunch*, 212 Mo. App. 249, 251 S.W. 742[2] (1923). See also *Stifel Estate Co. v. Cella*, 220 Mo.App. 657, 291 S.W. 515, 519[12] (1927); *Amick v. Baugh*, 66 Wash.2d 298, 402 P.2d 342, 347 (1965). *Martinsburg* discusses the distinction between a surety and a guarantor.

Defendants have never contended, either in the trial court or in their original brief in this court, that Exhibit 2 was anything other than a contract of guaranty.[8] Their theory throughout has been that they, the defendants, were guarantors and not sureties. In their reply brief defendants "urge this court to take this opportunity to broaden the scope of the statutes to include guarantors." Defendants' criticism of the authorities holding otherwise is that they are "very old cases." Although the precedents

may be old, their soundness, like the infinite variety of Cleopatra, is not withered by age.

Defendants' sixth point has no merit.

Defendants' seventh point has two prongs of doubtful kinship. They first say that plaintiff is not the real party in interest. This assignment was not raised in the trial court. Authority exists to the effect that such failure is fatal to its assertion on appeal, *State ex rel. Community Heat & A. C. Co. v. Schwartz*, 452 S.W.2d 243, 248[5] (Mo.App.1970); see also *Chicago & N. W. Transp. Co. v. Negus-Sweenie, Inc.*, 549 F.2d 47, 50[4, 5] (8th Cir. 1977), at least when the defect is not apparent on the record. *Hayes v. Jenkins*, 337 S.W.2d 259, 262[7] (Mo.App.1960). In addition the complaint lacks factual soundness and is based upon defendants' misconstruction of certain testimony.[9]

Defendants' second prong is that the trial court "failed to conclude that plaintiff's proper cause of action is one for contribution." So expressed, the statement does not satisfy Rule 84.04. A review of the record and the governing documents, heretofore discussed at length, leads to the conclusion that the relationship between the six defendants and plaintiff was that of guarantors-guarantee and not that of co-guarantors.

Defendants' seventh point has no merit.

The judgment is affirmed.

All concur.

---

8. The case is unusual because plaintiff was not the lender but was itself a guarantor of the loan. Perhaps Exhibit 2 should have been labeled a sub-guaranty.

9. Defendants' claim is based on the argument that Tullis, president of plaintiff, individually paid the bank, by his personal note, and that the plaintiff itself did not make the payment. Tullis' testimony was that he *personally signed* the note, not that he signed a *personal* note. Moreover, p. 9 of *defendants'* brief says, "*Plaintiff* apparently paid the bank."