Cheyenne A. FIEGENER, A Minor,
Donald Fiegener, and Stephanie
Fiegener, Plaintiffs–Appellants,

v.

FREEMAN–OAK HILL HEALTH SYSTEM, Virginia Palmer, R.N., Nancy S. Myers, R.N., and Sandra Martin, L.P.N., Defendants–Respondents,

Patrick S. Dunlap, M.D., Defendant–
Appellant.

Nos. 22361, 22362.

Missouri Court of Appeals,
Southern District,
Division Two.

June 30, 1999.

Motion for Rehearing and Transfer
Denied July 22, 1999.

Application for Transfer Denied
Aug. 24, 1999.

Bryan W. Smith, Fisher, Cavanaugh & Smith, Topeka, KS, for Plaintiffs/Appellants.

Linda Cary Hinshaw, The O'Malley Law Firm, Clayton, James Bandy, Blackwell, Sanders, Peper, Martin, Kansas City, for Defendant/Appellant.

Kent O. Hyde, William C. Love, Harrison, Tucker & Hyde, Springfield, for Respondent.

1. Herein, when referring collectively to Freeman Hospital, Palmer, Myers, and Martin, we call them "Hospital Defendants." When referring collectively to all defendants, we call

KENNETH W. SHRUM, Presiding Judge.

This is a medical malpractice case that was allegedly compromised and settled just minutes before a jury returned a verdict for Plaintiffs against Defendant Patrick Dunlap, M.D. ("Dr.Dunlap"). The issue presented is whether the trial court erred in overruling motions to enforce the alleged settlement agreement on the basis that the agreement lacked the element of mutual assent. We conclude the trial court did err. We reverse and remand with directions.

## FACTS

This case involves allegations of medical negligence during the birth of Cheyenne Andrea Fiegener ("Cheyenne"). Plaintiffs alleged that the negligence of Dr. Dunlap, Freeman–Oak Hill Health System, Virginia Palmer, R.N., Nancy S. Myers, R.N., and Sandra Martin, L.P.N., during labor and delivery caused brain damage and other injuries to Cheyenne.[1]

The trial began January 20, 1998, and the jury got the case on January 28 at 5:10 p.m. At approximately 11:00 p.m., the jury asked to see a "life care plan" Plaintiffs had placed into evidence. A few minutes later, the jury asked to see the report of Plaintiffs' economist. In the report, Plaintiffs' economist projected Cheyenne's future medical and healthcare needs at "somewhere from $3.8 million up to $6.5 million."

At 11:30 p.m., while the jury was deliberating, the litigants' attorneys made the following record:

"BY MR. HYDE: This is Kent Hyde for the defendants hospital and nurses in this case. It's about 11:30 p.m. and we have just reached a settlement agreement with the plaintiffs. So on behalf of

them "Defendants." Otherwise, we refer to each party individually as identified in the body of the opinion.

all the defendants with the plaintiffs whereby we have entered a high-low agreement. If the plaintiffs recover a net judgment of one million dollars or less defendants will pay one million dollars. If plaintiffs receive a jury verdict between—plaintiffs' judgment against the defendants between one million and four million dollars then plaintiffs will recover the actual net judgment. If plaintiffs recover a net judgment against defendants of over four million dollars then the net amount of the judgment to be enforced against defendants will be four million dollars."

"BY MR. FISHER: [Plaintiffs' counsel] To clarify that's a settlement that will not be payable in installments for a hundred years or something else—"

"BY MR. HYDE: No."

"BY MR. BANDY: [Dunlap's counsel] No."

"BY MR. FISHER: It will be a cash settlement at the conclusion—"

"BY MR. BANDY: Or a structured settlement as we—"

"BY MR. FISHER: As the plaintiffs agree. And we further agree that we're going to work together, if we can at the conclusion of this case, put together on some sort of a trust that will keep the plaintiffs' minor eligible for whatever medicaid or other benefits might be available to her or otherwise available were it not for the judgment and that's yet to be worked out. But they've agreed to cooperate in that and it may involve even dismissing the case and the judgments and working some other settlement on a cash basis within the limits indicated."

"BY MR. BANDY: We agree and would work with you to try to achieve that goal, but just so the record is clear if the plaintiffs recover a judgment between one million and four million that's the actual amount that will be recoverable."

"BY MR. FISHER: And just for the record we're talking about net judg-

ment. After the application of any applicable caps there might be by Missouri law."

"BY MR. HYDE: That is correct. Yes, under Chapter 538, you are correct."

"BY MR. FISHER: Anything else we need to talk about? One other thing. You each have different limits of coverage, but I understand that you've worked out the contributions between yourselves so we need not be concerned about that."

"BY MR. HYDE: On the one and four that is correct."

"BY MR. FISHER: Thank you, sir."

Attorney Fisher's mention of "different limits of coverage" near the end of this on-the-record exchange referred to the knowledge of all parties about the available liability insurance coverage, i.e., Dr. Dunlap's coverage was $1 million, whereas, *in toto*, the Hospital Defendants' coverage was $8 million.

Some eighteen minutes later, at 11:48 p.m., the attorneys again went on the record. Attorney Hyde sought to clarify the earlier record by stating, "It was the intent of the nurse defendants and Freeman Hospital to only accept their percentage of the net fault assessed to them. Apparently that was not well understood, and we wanted to now express after talking about that, that that was what was intended in the settlement."

At 11:50 p.m., the jury announced its verdicts. The jury assessed Dr. Dunlap's fault at 100%, assessed Hospital Defendants' fault at zero percent, and awarded Plaintiffs Cheyenne and her mother damages of $1,346,894.85 and $15,572.26, respectively. On February 11, 1998, the trial court entered judgment against Dr. Dunlap in accordance with the jury's verdicts.[2]

Plaintiffs and Dr. Dunlap promptly filed motions seeking approval and enforcement of the alleged settlement agreement and entry of judgment thereon.[3] Specifically,

---

2. In the judgment, the trial court rounded Cheyenne's award to $1,346,894.00.

3. Plaintiffs' and Dr. Dunlap's respective motions sought enforcement of the settlement

they asked that the court enter a judgment for Cheyenne's verdict amount against all defendants, not just against Dr. Dunlap. After hearing arguments on the motions, the trial court granted Dr. Dunlap leave to supplement the record. Under this order, depositions were taken of all parties' attorneys. Also, depositions were taken of insurance company employees involved in the January 28, 1998, settlement talks. Dr. Dunlap then filed an additional motion asking the trial court to vacate the February 11, 1998, judgment and to amend or modify the same to "reflect the settlement agreed to among the parties to this case prior to the jury's verdict." Plaintiffs joined in this motion.

The trial court overruled Plaintiffs' and Dr. Dunlap's motions to enforce the settlement and amend the judgment, stating: "The lateness of the hour, the lengthy jury deliberations, the weary attorneys, the nature of the written request for exhibits by the deliberating jury, the large amount of dollars in controversy, the haste to get a high-low agreement before the verdict was reached, and perhaps many other intangibles may well have conspired to create an atmosphere where these highly skilled and competent attorneys could not and did not come to a meeting of the minds in attempting to reach this settlement agreement. Whatever the reason may have been, a mutuality of assent did not occur between the hours of 11:30 p.m. and 11:50 p.m. on the 28th day of January, 1998 to create a settlement agreement which is capable of enforcement."

Plaintiffs and Dr. Dunlap appeal the denial of their various motions regarding the alleged settlement.

## DISCUSSION AND DECISION

Plaintiffs charge that the trial court committed reversible error in denying their various motions relating to the alleged settlement agreement because, as a

agreement on behalf of minor plaintiff Cheyenne. Consequently, the issues on appeal pertain solely to Cheyenne's judgment for

matter of law, they "had a binding contract with the Defendants whereby Defendants collectively agreed to pay Plaintiffs a settlement of not less than $1,000,000.00 and up to a maximum of $4,000,000.00, in lieu of any judgment ... entered upon the verdict returned by the jury." Similarly, Dr. Dunlap asserts that the trial court erred in denying his motions relating to the settlement agreement because "the material terms of the parties' agreement were sufficiently definite to constitute a contract under Missouri law."

■ An oral stipulation for the compromise and settlement of claims growing out of a personal injury suit, made in the presence of the parties and preserved in the record, is as binding as a written agreement. *See Croker v. Consolidated Service Car Co.*, 365 S.W.2d 524, 530[1] (Mo.1963). Since settlement is a species of contract, it is governed by contract law. *Payne v. E & B. Carpet Cleaning, Inc.*, 896 S.W.2d 650, 651[1] (Mo.App.1995). Consequently, a settlement must possess all the essential elements of a contract to be legally valid and enforceable. *Randall v. Harmon*, 761 S.W.2d 278, 279[3] (Mo. App.1988). Here, the trial court held the settlement agreement was unenforceable because it lacked "mutuality of assent."

■ A "meeting of the minds," or "mutual assent," of all parties is essential to the formation of a contract. *Karsch v. Carr*, 807 S.W.2d 96, 99 (Mo.App.1990); *Tom Davis Ins. Agency, Inc. v. Shivley*, 799 S.W.2d 195, 197 (Mo.App.1990). In Missouri, courts look to the parties' *objective* manifestations of intent to determine whether there was a "meeting of the minds." *McDaniel v. Park Place Care Center, Inc.*, 918 S.W.2d 820, 827[15] (Mo. App.1996). "A person's subjective intent is irrelevant." *Id.*

■ Plaintiffs and Dr. Dunlap both assert, *inter alia*, that the issue here is

$1,346,894.00, and the judgment in favor of Cheyenne's mother for $15,572.26 is not implicated.

solely one of law. They rely upon the principle that where there exists an unambiguous and complete contract, it must be enforced as written. *Kramer v. Fallert,* 628 S.W.2d 671, 674 (Mo.App.1981). Whether a contract is ambiguous is a question of law for the trial court to decide in the first instance. *Waldorf Inv. Co. v. Farris,* 918 S.W.2d 915, 919[5] (Mo.App. 1996). "That question is also one of law on appeal, the standard for review of which is *de novo* with the appellate court independently considering the evidence and reaching its own conclusions." *Id.* at 919[6].

We now look at whether the essential terms of this contract were sufficiently certain, complete, and unambiguous to make it capable of enforcement without resort to extrinsic evidence. We do so with the aid of these rules of construction for unambiguous contracts.

> "The courts seek to ascertain the intent of the parties by giving to the language used its natural, ordinary, and common sense meaning, but they also look to the entire contract; and the court should consider the object, nature and purpose of the agreement.... [T]he spirit, purpose and substance of the agreement must control rather than its letter...."

*Wilshire Const. Co. v. Union Elec. Co.,* 463 S.W.2d 903, 906[3] (Mo.1971). Also, although dicta, our supreme court has said that "collateral facts and circumstances may be introduced to ascertain the subject matter of the [unambiguous] contract and to aid in interpreting it, [but] such facts cannot cause the court to read into the contract something which it does not say." *Craig v. Jo B. Gardner, Inc.,* 586 S.W.2d 316, 324[6] (Mo.banc 1979).

Here, when attorney Hyde announced "on behalf of all the defendants with the plaintiffs [that] we have entered into a high-low agreement," the following circumstances attended. The parties were in their seventh or eighth day of trial. Claims manager Jerry Jacober, who worked for the Hospital Defendants' insurer, had been at the trial "most of the time," including while the jury was deliberating. Ronald Poindexter, vice president of the firm handling the claim for Hospital Defendant's insurer, also attended part of the trial, including the evening of January 28 while the jury was out. Also, Maureen Doyle, a claims supervisor for Dr. Dunlap's insurer, was present. Everyone, including lawyers and claims people, knew of the insurance coverage limits, i.e., Dr. Dunlap's policy limit was $1 million and Hospital Defendants' coverage was $8 million.

Earlier, on behalf of his clients, Hospital Defendants and their insurer, Poindexter, had extended several offers to Plaintiffs to enter into a "high-low" settlement. Plaintiffs had rejected those offers. Also, on behalf of Dr. Dunlap's insurer, Maureen Doyle had unsuccessfully tried to settle separately with Plaintiffs. Late on the evening of January 28, however, after the jury asked to see the life care exhibit and the economist's report, Plaintiffs' lawyer approached Defendants' lawyers with a joint high-low settlement proposal. Plaintiffs' proposal was presented to the claims people for the respective insurers. Thereon, Poindexter, who had limited settlement authority, called his supervisor, Mr. Dunn. They talked briefly and then attorney Hyde spoke with Dunn for "two, three minutes at the most." Next, Poindexter and Hyde walked from the room where they had made the call into a hallway where they met with Maureen Doyle and Dr. Dunlap's attorney, Jim Bandy. During this meeting they discussed the proposed settlement. After the "hallway" meeting broke up, Fisher, Bandy, and Hyde "went to the bench" and made the initial settlement agreement record set forth above.

Reading the language used by the attorneys at 11:30 p.m. in context, and giving such language its natural, ordinary, and commonsense meaning, we find that the agreement announced then was not ambiguous and did not lack any essential contractual elements as between Plaintiffs on one side and Dr. Dunlap and Hospital Defendants, collectively, on the other.

The record of the 11:30 p.m. settlement began with attorney Hyde announcing, "This is Kent Hyde for the [Hospital Defendants] in this case. It's about 11:30 p.m. and we have just reached a settlement agreement with the plaintiffs. So on behalf of *all* the defendants with the plaintiff whereby we have entered a high-low agreement." Thus, using plain language, Hospital Defendants announced their intent to act collectively and jointly with Dr. Dunlap and his insurer to settle with Plaintiffs. Attorney Hyde continued,

"If the plaintiffs recover a net judgment of one million dollars or less *defendants will pay* one million dollars. If plaintiffs receive a jury verdict … against the defendants between one million and four million dollars then plaintiffs *will recover* the actual net judgment. If plaintiffs recover a net judgment against defendants of over four million dollars then the net amount of the judgment to be enforced *against defendants* will be four million dollars." (Emphasis added.)

■ Attorney Hyde's language, i.e., "defendants will pay," "plaintiffs will recover," and "the net amount to be enforced against defendants," viewed objectively, shows that all defendants agreed to contribute to Plaintiffs' award under the settlement and that Plaintiffs *would* recover the amounts stated. This interpretation follows no matter whether the award happened to fall on the low end of the agreement, the high end of the agreement, or somewhere between. Attorney Hyde's actions and words would lead any reasonably prudent person to this conclusion as his 11:30 p.m. remarks offered no indication that his clients intended to limit the scope of the settlement as he contended at 11:48 p.m. "Any reservation or limitation as to the scope of a settlement agreement must be clearly expressed." *Angoff v. Mersman,* 917 S.W.2d 207, 211[8] (Mo.App. 1996). Our job is to decide what the parties intended by what they said, and we cannot be concerned with what they may have subjectively intended to say. *Monterosso v. St. Louis Globe–Democrat Pub. Co.,* 368 S.W.2d 481, 487[4] (Mo.1963).

From Mr. Hyde's words and actions at 11:30 p.m. and the attending circumstances, we conclude that Hospital Defendants objectively manifested their mutual assent to act jointly and collectively with Dr. Dunlap to settle Plaintiffs' suit by (1) paying Plaintiffs $1 million if the jury's verdict was less than that amount, (2) paying Plaintiffs $4 million if the jury's verdict was greater than $4 million, and (3) paying Plaintiffs what the jury awarded if its verdict was between $1 million and $4 million dollars.

■ In so holding, we have neither forgotten nor ignored the supplemental record made by attorney Hyde at 11:48 p.m. However, his unilateral act of supplementing the record cannot alter the terms of the contract entered into earlier. At best, attorney Hyde's actions belatedly revealed the subjective intent of his client. We must consider what the parties to the contract actually said and not what the Hospital Defendants secretly intended or what they might have said if they had decided to further explain their intentions. *Monterosso,* 368 S.W.2d at 487[4].

■ Next, we consider the trial court's finding that "a mutuality of assent did not occur between the hours of 11:30 p.m. and 11:50 p.m. on the 28th day of January, 1998 to create a settlement which is capable of enforcement." The trouble with this finding is that mutual assent between Defendants regarding their respective contributions toward the settlement was not a prerequisite to entering into an enforceable settlement agreement between Plaintiffs and Defendants, collectively. This follows because:

"1. Under the common law, where two or more persons undertake the performance of an obligation, the presumption is that the undertaking was joint. Words of express joinder are not necessary for this purpose. Words of severance are required to produce a several responsibility, and in the absence of such words the undertaking is joint and not several.

"2. A joint contract is one by which two or more promisors are jointly bound to fulfill its obligations, and either of whom may be charged with the entire liability under the contract.

"3. Whether the promises are several or joint, or joint and several, depends on the construction of the language used, and the intention of the parties as manifested by the language must be followed by the court.

"4. An obligation undertaken by two is presumably joint, the absence of express words to render it joint and several, or a statute declaring every contract, though joint in its terms, to be several as well as joint."

*Don L. Tullis & Assoc., Inc. v. Gover,* 577 S.W.2d 891, 900[13–18] (Mo.App.1979)(citing *Illinois Fuel Co. v. Mobile & O.R. Co.,* 319 Mo. 899, 8 S.W.2d 834, 840[5–7] (1928)).

Here, Defendants' agreement with Plaintiffs at 11:30 p.m. contained no "words of severance." It is appropriate, therefore, to presume that Dr. Dunlap's and the Hospital Defendants' undertaking was joint as to Plaintiffs. *See Gover,* 577 S.W.2d at 900. The *Gover* rules impose liability on Defendants jointly and severally no matter the existence or the substance of a collateral agreement of contribution between Defendants. It is immaterial whether Dr. Dunlap and Hospital Defendants did or did not mutually assent during 11:30 to 11:50 p.m. to their respective contributions to the settlement. Defendants had already undertaken the obligation of settling with Plaintiffs under the high-low ranges stated; consequently, Plaintiffs' mutual assent about how Defendants discharged their contractual liability was not required. Contrary to the trial court's finding, the agreement put on record at 11:30 p.m. did create a settlement capable of enforcement. A judgment ordering specific performance of the settlement, jointly and severally, is capable of enforcement.

■■■■ Finally, we consider and reject Hospital Defendants' argument that there could be no settlement agreement here because the trial court never approved "any proposed contract to settle the minor's claim" as required by § 507.184, RSMo 1994[4] and Rule 52.02(n), Supreme Court Rules (1998).[5] The legislative intent underlying § 507.184 was to maximize the protection afforded a minor's legal action and insure that any settlement is in the best interest of the child. *See Y.W. v. National Super Markets,* 876 S.W.2d 785 (Mo.App.1994). Here, however, because the jury's award fell between $1 million and $4 million, it was the jury that fixed Cheyenne's damages. Under the circumstances, § 507.184 was not implicated and trial court approval of the agreement was not required.

We reverse and remand with directions that the trial court amend and modify the judgment entered on February 11, 1998, so that, as amended, Plaintiff shall have a judgment against Patrick Dunlap, M.D., Freeman–Oak Hill Health System, Virginia Palmer, R.N., Nancy S. Myers, R.N., and Sandra Martin, L.P.N., jointly and severally, for $1,346,894, together with interest thereon from and after February 11,

---

**4.** In pertinent part, § 507.184 provides:

"2. The next friend ... shall have the power and authority to contract on behalf of the minor for a settlement of the minor's claim ... provided that such contract and settlement shall not be effective until approved by the court. ...
3. The court shall have the power and authority to hear evidence on and either approve or disapprove a proposed contract to settle an action or claim of a minor...."

**5.** In part, Rule 52.02(n) provides:
"The powers and duties of the next friend ... and of the courts in respect to minors ... shall be exercised in accordance with the provisions of the Revised Statutes of Missouri including, but not limited to, Section[ ] 507.184...."

1998, at the statutory interest rate of nine (9) percent per annum.

MONTGOMERY, J., and GARRISON, C.J., concur.