Robert E. SCHUBERT, Plaintiff–
Respondent,

v.

TRAILMOBILE TRAILER, L.L.C., and
Freightways, Inc., Defendants,

and

National Union Fire Insurance Com-
pany of Pittsburgh, PA., Interve-
nor/Defendant–Appellant.

No. 25050.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 14, 2003.

Douglas R. Richmond, Patrick J. Kenny, Carlton D. Callenbach, Kansas City, for Appellant.

Clifton M. Smart, Steve Garner, Neil Chanter, The Strong Law Firm, P.C., Springfield, for Respondent.

PHILLIP R. GARRISON, Judge.

This is a dispute concerning whether a defendant in a personal injury case and its excess insurance carrier are jointly and severally liable for a payment due under a settlement agreement. Robert E. Schubert ("Robert")[1] filed suit against Trailmobile Trailer, L.L.C. ("Trailmobile") and Freightways, Inc. ("Freightways") in the trial court for injuries and damages sustained in a collision between his vehicle and a semi-tractor-trailer that occurred on January 9, 1999. Subsequently, a settlement agreement was reached calling for payments to Robert totaling $4,250,000. Those payments have been made, save $800,000. Robert contended in a Motion To Enforce Settlement Agreement ("the motion") that there is joint and several liability for payment of the settlement between Trailmobile, which was then in bankruptcy, and its excess insurance carrier, National Union Fire Insurance Company of Pittsburgh, PA ("National Union"). The trial court agreed and entered a judgment for $800,000 against National Union. This appeal followed. We affirm.

---

1. For ease of identification, given names and, in some cases, surnames will be used in this opinion. No disrespect is intended.

The standard of review for judgments enforcing settlement agreements is established by Rule 84.13(d).[2] That rule's predecessor, which was essentially the same as the present rule, was interpreted as requiring that the trial court's judgment be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

 The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's judgment, and all contrary evidence and inferences must be disregarded. *Liquidation of Professional Medical Ins. Co. v. Lakin*, 88 S.W.3d 471, 475–76 (Mo.App. W.D.2002). This is because credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of the testimony of any witness. *Herbert v. Harl*, 757 S.W.2d 585, 587 (Mo. banc 1988). The same deference does not apply, however, if the law has been erroneously declared or applied. *In re Marriage of Fry*, 827 S.W.2d 772, 776 (Mo.App. S.D.1992). In such cases, we independently evaluate the trial court's legal conclusions of law. *Springfield Land and Development Co. v. Bass*, 48 S.W.3d 620, 624 (Mo.App. S.D. 2001).

Viewed in light of the standards described above, the evidence in this case was: Trial of Robert's suit against Trailmobile and Freightways was scheduled to begin on Monday, December 3, 2001. On the preceding Thursday, November 29, the parties participated in a mediation. Those present or participating in the mediation by telephone included: Robert, his wife, and his attorneys, including Clifton Smart ("Smart"); Trailmobile's corporate representative, as well as its defense counsel, Mike Oliver ("Oliver"); an adjuster for Zurich Insurance Co. ("Zurich"), Trailmobile's primary insurer; Althea Garvey ("Garvey"), "Complex Director" for AIG Technical Services, Inc. ("AIG"), which was negotiating on behalf of National Union;[3] and Freightway's corporate representatives and its counsel. During the mediation process it became clear that Freightways was not willing to significantly participate in settlement discussions, and most of the negotiations occurred between Robert's attorneys and attorneys and representatives of Trailmobile and its insurers. The negotiations also involved two companion cases involving injuries received by Robert's wife and his mother in the same accident. Smart and the law firm of which he is a member represented all three plaintiffs.

At the hearing on the motion, Smart testified that he told the other parties that the plaintiffs were not willing to resolve less than all three pending cases. When the mediator indicated that Trailmobile and its insurers were not prepared to negotiate all three cases, Smart offered to settle Robert's case for $4,250,000, of which Zurich would pay $1,500,000, with the remaining $2,750,000 to be paid by Trailmobile and AIG, and they would submit the other two cases to binding arbitration. A part of that offer was that the other parties had until 4:00 P.M. the next day (Friday) to either accept or reject the offer. The next morning (Friday) Smart rejected Oliver's inquiry about whether they would settle all three cases for

---

2. All references to rules are to Missouri Rules of Civil Procedure (2003) unless otherwise indicated.

3. The parties agree that AIG and National Union are, for the purposes of the issues here, one and the same.

$4,250,000. Smart testified that later that morning Oliver called saying AIG wanted to break down the settlement so that Trailmobile would be responsible for a part of it, AIG would pay another part, and together with Zurich's $1,500,000, their payments would total $4,250,000. According to Smart, he told Oliver that he could not agree to that because Trailmobile was "not in good shape." Smart explained that the plaintiffs had discovered Trailmobile was having financial difficulties from discovery concerning a punitive damage claim in the case.

According to Smart, Oliver called him again, saying that Garvey wanted to negotiate with Smart directly. When Garvey called Smart, she tried to settle all three cases for $4,250,000, but Smart again refused. She also asked if he would agree that Trailmobile would pay a portion of a settlement, but Smart refused. Smart also testified that there was never a discussion of how much of the settlement Garvey wanted Trailmobile to be responsible for.

In response to Smart's rejection of her offer, Garvey said, "AIG needs some time to get together this much money. Can we have additional time?" When they agreed that the remainder of the settlement, after Zurick's payment, would be paid by March 6, 2002, Garvey said, "Well, then, we have a deal." Garvey stated that they were settling Robert's case for $4,250,000, and were agreeing to submit the other two cases to binding arbitration.

Later that day (Friday, November 30, 2001) Smart received a letter from Oliver memorializing the settlement and stating that "[o]n behalf of [Trailmobile] and [Zurich] and [AIG] we will pay the amount of [$4,250,000] to settle all the claims of [Robert]." It also specified that the portion of the settlement from Zurich would be paid within thirty days, and that the "remainder from Trailmobile and AIG shall be paid on or before March 6th, 2002." Oliver's letter invited Smart to "let [him] know if [he][had] misstated any of the terms of [their] agreement, or if [he][had] left anything out." Smart responded by letter on Monday, December 3, 2001, in which he said, "The only thing I would add is that the $2,750,000 to be paid by Trailmobile and AIG on or before March 6, 2002, will be paid regardless of the financial ability of Trailmobile to make its contribution." He stated that the "Plaintiffs don't care from whom that money comes, as long as the total amount with the Zurich contribution totals [$4,250,000]." No response to Smart's letter was received until a letter from Oliver was received in March 2002, when the less-than-total remaining payment was made by AIG. This letter is discussed in greater detail below.

In the first week of January 2002, Zurich sent its $1,500,000 check, along with a "Partial Release and Settlement Agreement" ("Partial Release") to Smart. The Partial Release, prepared by Oliver, contained the following paragraph:

> Defendant Trailmobile, and Zurich agree to pay the amount of $4.25 (Four Million Two Hundred Fifty Thousand Dollars) to settle all the claims of [Robert]. It is further agreed that the portion of this settlement paid by Zurich will be paid by January 7, 2002. The remaining settlement amount shall be paid by Trailmobile and AIG on or before March 6, 2002.

Smart and the three plaintiffs signed this Partial Release.

Smart testified that he had no knowledge of any side agreement between Trailmobile and AIG or National Union about which company would be paying what portions of the settlement. In fact, he testified that the first indication he had of any such side agreement was on March 7, 2002 when he received a letter from Oliver

along with an AIG check for $1,950,000, instead of $2,750,000. In that letter, Oliver informed Smart that

> [i]n reviewing the correspondence and settlement agreement in this case, it appears there is some difference of opinion regarding the responsibility for the payment of the remaining amount from Trailmobile.... In some of your earlier letters you mentioned that you expected AIG to pay or guarantee those amounts which Trailmobile had agreed to pay. AIG disagrees. The settlement agreement does not specify such an agreement. The final terms of the agreement were arranged directly between you and AIG in a telephone conversation without my participation, so I cannot offer any first hand [sic] information.

In an attempt to collect the remaining $800,000, Robert filed the motion. Included in the evidence presented to the trial court in support of that motion was the testimony of Smart referred to above.[4] The trial court concluded that while AIG and National Union may have intended that Trailmobile be responsible for part of the settlement, that was never a part of the agreement reached with Smart. It found that the agreement was that AIG or National Union and Trailmobile together would pay the part of the settlement remaining after Zurich's payment. The court noted that Oliver did not testify in opposition to the motion, a fact from which it drew an adverse inference. In its written judgment, the trial court found that a valid, legal, and binding settlement agreement was reached on November 30, 2001, the terms of which were that Trailmobile, National Union and Zurich agreed to pay Robert the sum of $4,250,000, of which National Union and Trailmobile would be jointly and severally liable for $2,750,000, by March 6, 2002, and that National Union breached the November 30, 2001 settlement agreement by failing to pay the remaining $800,000. The court entered judgment against National Union for $800,000 together with post-judgment interest. This appeal by National Union, raising two points, followed.

In its first point, National Union contends that the trial court erred in holding that it was jointly and severally liable for the $800,000 portion of the settlement agreement because the agreement created no such liability. It argues that the use of the word "and" in the agreement constituted a severance as a matter of law or, alternatively, that the evidence demonstrated that the parties intended that word to serve as a word of severance.

It is necessary at this point to consider which "Agreement" is for our review. In the argument section of its brief, National Union relies on the written Partial Release forwarded with Zurich's $1,500,000 check on January 7, 2002. That document, which states that it is "by and among" Robert,

---

4. National Union's counsel referred the trial court to an unsigned affidavit by Garvey in which she said it was never her intention, nor that of AIG or National Union, for there to be joint and several liability between National Union and Trailmobile. It was her intention, and that of AIG and National Union, that National Union would be liable for $1,950,000 of the settlement, and the remaining $800,000 would be paid by Trailmobile. Payment of the $800,000 was never to be AIG's or National Union's obligation, and she directed Oliver to draft the settlement terms so that National Union and Trailmobile would not be jointly and severally liable, and so that National Union would be liable for only $1,950,000 of the settlement. National Union's attorney informed the trial court that Garvey, who was out of the country, was signing a copy of the affidavit and it would be furnished later. The affidavit that was signed after the judgment was entered, and which is referred to later in this opinion, contained information not included in the one referred to at the time of the comments by National Union's attorney.

the other two plaintiffs, Trailmobile, Zurich, and AIG, was signed by Robert, the other two plaintiffs, and Smart, on January 9, 2002. The Partial Release contains a provision stating "[t]his [Partial Release] shall become effective following execution by all of the parties, and approval of the Court." The copies before this court show that it was not signed by Trailmobile, Zurich, or AIG. The agreement of November 30, 2001 was the one Robert sought to enforce in the motion, and it is the one that formed the basis for the trial court's judgment. Thus, the argument section of National Union's brief relates to an agreement not signed by all of the parties, and one which was not the basis for the judgment entered by the trial court.

However, it is also clear that the dispute between the parties is over the effect of the words "Trailmobile and AIG." Those words were used by Smart in describing the verbal settlement agreement reached with Garvey, and they were also used, along with the words "[o]n behalf of [Trailmobile] and [Zurich] and [AIG] we will pay the amount of [$4,250,000] to settle all the claims of [Robert]," in Oliver's letter to Smart confirming the agreement reached on November 30, 2001. Robert implicitly agrees that the issue for resolution is the effect of the agreement that Trailmobile "and" AIG will satisfy the settlement. Accordingly, we will consider *ex gratia* this appeal as relating to the effect of the word "and" in describing the parties' obligation for the settlement.

 "A joint contract is one by which two or more promisors are jointly bound to fulfill its obligations, and either of whom may be charged with the entire liability under the contract." *Fiegener v. Freeman–Oak Hill Health System*, 996 S.W.2d 767, 774 (Mo.App. S.D.1999). "It is characteristic of a joint obligation that each obligor is bound for the performance of the entire obligation." *Kay v. Freeman*, 785 S.W.2d 90, 93 (Mo.App. W.D.1990). "Co-promisors are liable 'jointly' if all of them have promised the entire performance which is the subject of the contract." Richard A. Lord, Williston, Contracts, § 36:1 4th ed. (1999). When a "several" obligation is entered into by two or more parties in one instrument, it is the same as though each has executed separate instruments, and each is bound separately for the performance which he or she promises, and is not bound jointly with anyone else. *Id.* "A 'joint and several' contract is a contract with each promisor and a joint contract with all, so that parties having a joint and several obligation are bound jointly as one party, and also severally as separate parties at the same time." *Id.*

We previously have described Missouri law concerning whether a contractual obligation is joint or several as follows:

1. Under the common law, where two or more persons undertake the performance of an obligation, the presumption is that the undertaking was joint. Words of express joinder are not necessary for this purpose. Words of severance are required to produce a several responsibility, and in the absence of such words the undertaking is joint and not several.

2. A joint contract is one by which two or more promisors are jointly bound to fulfill its obligations, and either of whom may be charged with the entire liability under the contract.

3. Whether the promises are several or joint, or joint and several, depends on the construction of the language used, and the intention of the parties as manifested by the language must be followed by the court.

4. An obligation undertaken by two is presumably joint, the absence of express words to render it joint and

several, or a statute declaring every contract, though joint in its terms, to be several as well as joint.[5]

*Fiegener* at 773–774 (citing *Don L. Tullis & Assoc., Inc. v. Gover*, 577 S.W.2d 891, 900 (Mo.App. S.D.1979)).

National Union seeks to establish that the word "and" in the phrase "Trailmobile and AIG" amounts to a specific word of severance, thereby establishing that liability for the remaining portion of the settlement is several rather than joint or joint and several. In support it cites *Herrick Motor Co. v. Fischer Oldsmobile Co.*, 421 S.W.2d 58 (Mo.App.Spfd.Dist.1967), in which the court referred to "and" as being conjunctive in comparison to "or," which it said is disjunctive and marks an alternative corresponding to "either" as "either this or that." *Id.* at 66. Similarly, National Union argues that the use of the word "and" in this agreement "requires the conclusion that both Trailmobile and National Union had discrete payment obligations"[6] making the trial court's conclusion that the two were jointly and severally liable an error of law. We disagree.

▇▇▇ First, any reservation or limitation as to the scope of a settlement agreement must be clearly expressed. *Angoff v. Mersman*, 917 S.W.2d 207, 211 (Mo.App. W.D.1996). A joint promise cannot be made several by any doubtful implication or limitations, but rather express words of severance must appear. *Illinois Fuel Co. v. Mobile & O.R.Co.*, 319 Mo. 899, 8 S.W.2d 834, 841 (1928). "And" is defined variously as "along with or together with," "as well as," and "to express the general relation of

connection or addition, [especially] accompaniment, participation, combination, contiguity." Webster's Third New International Dictionary (1976). To suggest that "and" amounts to a clear and express agreement that the parties shall be responsible severally, but not jointly, stretches the meaning of that word beyond its elasticity.

We must consider what the parties actually said and not what they secretly intended or what they might have said if they had decided to further explain their intentions. *Fiegener* at 773. As held in *Illinois Fuel Co.*, how the joint obligors might choose, as between themselves, to discharge the obligation, was a matter of no concern to the obligee. *Id.* at 842. Here, Smart's description of the telephone conversation, which the trial court was entitled to, and obviously did, believe, was that Garvey, AIG's representative, tried to get an agreement that Trailmobile would pay an unspecified part of the settlement amount, but Smart rejected that concept entirely. According to Smart, there was never mention of a specific amount Trailmobile would pay under such a scenario because the discussions never got to that point. Instead, Garvey told Smart that "AIG needs some time to get together this much money." After Smart had rejected the request that Trailmobile be responsible for paying part of the settlement, and after they had agreed that AIG could have until March 6, 2002 to "get together this much money," Garvey told Smart "we have a deal." Oliver's letter then described the agreement as follows: "On behalf of [Trailmobile] and [Zurich] and [AIG] we will pay

**5.** Section 431.110, RSMo (2000) provides that "[a]ll contracts which, by the common law, are joint only, shall be construed to be joint and several."

**6.** At oral argument of this case, National Union's counsel described "discrete" as "separate" and as "agreed between National Union and Trailmobile." There was no evidence before the trial court that Robert or Smart had actual knowledge of any "discrete" agreement between Trailmobile and National Union.

the amount of [$4,250,000] to settle all the claims of [Robert]." It also said, "we agree that the portion of this settlement from Zurich will be paid within [thirty] days from today's date,[7] and that the remainder from Trailmobile and AIG will be paid on or before March 6th, 2002." This was followed by Smart's letter making it clear that the agreement was that the $2,750,000 would be paid regardless of the financial status of Trailmobile.

In analyzing National Union's theory that the word "and" results in the obligations of Trailmobile and AIG being several as opposed to joint or joint and several, it is significant that no attempt was made to apportion and identify the specific obligation of each. As indicated above, promisors are obligated jointly if all of them have promised the entire performance which is the subject of the contract. This principle has been recognized in Missouri in cases such as *Illinois Fuel Co.* There, two railroad companies, described collectively in the contract as "the railroad companies" contracted to buy coal. One of the railroad companies claimed that it was not liable for the cost of coal delivered to the other, i.e. that its liability under the contract was several rather than joint and several. In holding that there was joint and several liability, the court noted that there was no severance of the subject matter. *Id.* at 841. In *Kay,* the issue was whether two corporations were jointly responsible for a real estate broker's commission on the sale of motels owned by the other corporation. *Id.* at 93. Under the listing contract, the broker was to receive a $1,000,000 commission for the sale of five motels, three of which were owned by one corporation, and two owned by the other. The court, in finding joint and several

liability, noted, among other things, that the selling price was not distributed among the motels or the corporations. *Id.* Likewise, in the instant case, the portion of the settlement that National Union claims Trailmobile is responsible for is not identified in the agreement reached by the parties. According to Smart's testimony, which the trial court was entitled to believe, the amount that AIG wanted Trailmobile to be responsible for was never even discussed. This is not in keeping with the principle discussed above that an obligation that is several is one to which each obligor is bound separately for the performance which he or she promises.

As an extension of its argument that the use of the word "and" makes this obligation several, rather than joint, National Union points to cases in which there was a collective description of the parties held to be jointly and severally liable. These include *Illinois Fuel Co.* (cited in *Tullis* and *Fiegener*) *Eul v. Beard,* 47 S.W.3d 424 (Mo.App. S.D.2001); *Kay;* and *Moore v. Seabaugh,* 684 S.W.2d 492 (Mo.App. E.D.1984). It argues that, unlike the instant case, where the parties with the duty to pay were designated as Trailmobile "and" AIG, those cases involved designations of the responsible parties as a group composed of the individual parties. Thus, *Illinois Fuel* involved a contract identifying the responsible parties as two railroad companies, but in which they were referred to collectively as "the railroad companies." *Id.* at 841. *Eul* involved a contract collectively referring to the responsible parties as "Sellers," *Id.* at 424, and in *Moore,* the contract identified the individual parties, but collectively referred to them as "Second Party." *Id.* at 495. In *Kay,* there was an oral contract

---

**7.** Apparently the parties were in agreement that Zurich would be responsible for $1,500,000 of the settlement.

for a real estate listing of five motels, three of which were owned by one corporation, and two owned by another corporation. The subsequent sales contract referred to both corporations collectively as "seller." *Id.* at 92. Contrary to National Union's characterization of those cases as being distinguishable from the instant case because there was no collective designation here, we note that in Oliver's letter to Smart confirming the verbal settlement agreement found by the trial court to have been breached, he said, "On behalf of [Trailmobile] and [Zurich] and [AIG] *we* will pay the amount of [$4,250,000] ..." (emphasis added).

■ We also note that in each of the cases cited by National Union for this proposition, other factors indicated that the obligations were joint. Nevertheless, the fact remains that this was an undertaking by two parties, and under the authorities previously referred to, the presumption is that it is a joint obligation. Words of express joinder are not necessary, and words of severance must be expressly stated. The emphasis here is upon the lack of express words of severance, as opposed to the lack of other words indicating a joint obligation.

National Union also argues that extrinsic evidence could not be considered in construing the settlement agreement at issue. It argues that when an agreement is reduced to writing, the law presumes that it embodies the entire agreement of the parties, citing *Hahn v. Hahn,* 488 S.W.2d 203, 205 (Mo.App.K.C.1972). As indicated above, however, the record indicates that the written settlement agreement relied upon by National Union was not signed by it or the other parties agreeing to be responsible for the settlement, and it specified that it was not to be effective until signed by all of the parties and approved by the court. In any event, that

is not the agreement the trial court found had been made and breached, and from which this appeal flows.

National Union also argues that even if the extrinsic evidence could be considered, the judgment is against the weight of the evidence under the standard of *Murphy.* Our review of the evidence described earlier does not lend itself to that conclusion, especially considering the fact that the trial court was entitled to believe the testimony of Smart. This point is denied.

In its other point on appeal, National Union argues that the trial court erred in holding it liable for Trailmobile's self-insured retention ("SIR"). This argument stems from the fact that under its primary policy with Zurich, Trailmobile had an SIR of $500,000, a part of which allegedly remained available at the time of settlement after deducting Trailmobile's defense costs. National Union argues that the remaining SIR was $300,000, which, together with $500,000, totaled the $800,000 it says Trailmobile agreed with AIG to make available for settlement purposes. It argues that by requiring it to be responsible for the $800,000 the trial court was requiring it, as an excess carrier, to " 'drop down' to provide coverage for an insolvent insured."

In support of this point, National Union cites its policy provisions stating that it will be liable only for that portion of damages in excess of the insured's SIR, and cites cases from other jurisdictions holding that an insured's insolvency does not require an excess carrier to "drop down" and provide coverage for the amount of the remaining SIR. Accordingly, it argues that if it owes anything, it cannot exceed $500,000 (the amount by which it says the $800,000 exceeds Trailmobile's remaining applicable SIR).

It is determinative, however, that, as we held under point one, National Union's liability for the entire settlement amount above the $1,500,000 payment by Zurich is joint and several. There was no provision in the settlement providing for exclusion of the matters now argued by National Union. None of the authority cited by National Union would relieve it from liability for the $800,000 (even if that includes some of Trailmobile's remaining SIR under the Zurich policy) where its joint and several liability arises from its agreement to settle the case in that fashion. Where an appellant neither cites relevant authority in support of its position, nor offers an explanation for why none is available, an appellate court is justified in considering the point abandoned. *Shiyr v. Pinckney,* 896 S.W.2d 69, 71 (Mo.App. S.D. 1995).

Additionally, we note that the only indications in the record of how much of Trailmobile's SIR remained unused are not available for our consideration. One was a statement by National Union's counsel to the trial court at the time of the hearing on the motion. We cannot accept counsel's statements as a substitute for proof even if there is no reason to doubt their accuracy. *AJM Packaging Corp. v. Crossland Const. Co., Inc.,* 962 S.W.2d 906, 910 (Mo.App. S.D.1998). Another was an affidavit of Garvey that was signed and filed after the judgment was entered in this case. Exhibits not offered at trial and affidavits created after the fact are not properly part of the record on appeal, and as far as our review is concerned, those documents do not exist. *Henning v. Director of Revenue,* 790 S.W.2d 513, 514 (Mo.App. E.D.1990). It is the appellant's burden to affirmatively establish reversible error. *In Interest of B—M—P—,* 704 S.W.2d 237, 249 (Mo.App. S.D.1986). This point is therefore denied.

The judgment of the trial court is affirmed.

MONTGOMERY, P.J., and BARNEY, J., concur.