In the Missouri Court of Appeals
 Eastern District
 DIVISION ONE
PIVOT HOLDINGS, LLC AND ) No. ED108856
DH ADVISORS, )
 )
 Appellants, )
 ) Appeal from the Circuit Court
 ) of the City of St. Louis
 vs. ) Cause No. 1222-CC00830
 )
THE DANIEL AND HENRY COMPANY, ) Honorable Michael F. Stelzer
 )
 Defendant, ) Filed: April 20, 2021
 )
 and )
 )
DEVEREUX MURPHY, LLC, )
 )
 Respondent. )

 OPINION

 I. Introduction

 DH Advisors, LLC (“DHA”) appeals the judgment granting the motion of Devereux

Murphy, LLC (“DM”) to enforce its attorney’s lien. In its seven points on appeal, DHA

challenges both the right of DM to recover fees from DHA and the manner in which the trial

court ordered payment of those fees. We conclude that none of these points have merit. The

judgment was supported by substantial evidence, is not against the weight of the evidence, and

does not misapply the law. We affirm.

 1
 II. Procedural and Factual Background

 DHA is an insurance brokerage firm formerly affiliated with The Daniel & Henry

Company (“D&H”), a collective of insurance brokerage firms and brokers. In November of

2011, DHA left D&H and attempted to move its business to Pivot Holdings, LLC f/k/a AHM

Financial Group, LLC (“Pivot”).1 Pivot and DHA entered into a Contribution Agreement setting

out the terms of DHA contributing and Pivot acquiring DHA’s business. D&H tried to prevent

this move, which ultimately led to DHA and Pivot engaging the DM law firm, who had

represented Pivot years before in an unrelated matter. In February of 2012, DHA, Pivot and DM

entered a Joint Defense, Common Interest and Confidentiality Agreement (“Joint Defense

Agreement”), which provided that DHA and Pivot had a “mutuality of interest in a common and

joint defense” and wanted to pursue a lawsuit against D&H with a single counsel. DHA and

Pivot therefore “waived any conflict of interest that may result or exist as a consequence” of

representation by one counsel, but retained their right to raise “any conflict of interest which may

arise in the future;” there is also a clause relating to the specific conflict of interest that may arise

if one client becomes a testifying witness. The Joint Defense Agreement also addressed

confidentiality during this pursuit of DHA and Pivot’s “separate but common interest” and the

sharing of otherwise privileged materials between the clients to best serve their “mutual

interests.” The petition DM filed on behalf of Pivot and DHA in 2012 asserted counts on behalf

of Pivot against D&H for money had and received and for tortious interference with a contract

and counts on behalf of DHA against D&H for breach of contract and for tortious interference

with a contract.

1
 AHM Financial Group, LLC changed its name to Pivot Holdings, LLC during the pendency of this case. For ease,
we refer to this entity as “Pivot” irrespective of whether the reference relates to a time before or after the name
change.

 2
 It is undisputed that the Joint Defense Agreement and the Contribution Agreement are

silent on the matter of DM’s attorney’s fees. It is also undisputed that DM provided its legal

services at an hourly rate and that the bills would be sent to Pivot. For years, DM sent Pivot the

bills, Pivot paid the bills and there were no disputes. By late 2014, however, Pivot had stopped

paying bills. In a December 20, 2014, internal email, Pivot discussed the fact that it was “out of

money” and proposed they tell DM that Pivot could pay them the following November or “they

can go contingent on DHA and we will offer them their current amount due plus 20%” unless

DHA wants to “man up.” Pivot forwarded that email to DM on December 22nd, explaining that

it is “short on cash,” and asked DM to consider deferred payment or the “contingent

arrangement.” DM responded the next day by email and copied DHA into this email chain. DM

rejected Pivot’s proposal and stated that “all parties need to make immediate arrangements to

work through this.” DM noted that trial was set in 19 days and it was unfair to ask DM to

continue working on the case “if Pivot has no intention of paying.” Later that day, Pivot replied

that it did intend to pay and was going to ask DHA for “some help on this” to try to scrape

together some money. DM wrote back again expressing confusion that Pivot and “the other

partners of the Pivot ownership group” did not have sufficient resources to pay the outstanding

fees.

 On December 30, 2014, Pivot forwarded another internal email to DM about D&H’s

interest in talking about settlement, noting that Pivot had suggested $1.8 million but D&H was in

the $700,000-800,000 range. Pivot told DM that it was “inclined to reach agreement with D&H.”

 On January 5, 2015, DM emailed Pivot, copying DHA, saying “we have an irreconcilable

conflict that must be addressed at once.” DM explained that Pivot “has indicated it is going to

settle this case” and instructed DM to cease preparing for the January 12th trial setting. On the

 3
other hand, DHA “has indicated that it would like to proceed to trial in this matter in the event

the Plaintiffs and Defendant are unable to settle the matter on satisfactory terms.”

 Time is running very short because the necessary preparations must be undertaken
 immediately to properly prepare for trial. Therefore, unless I hear from both parties
 by 10:00am tomorrow--January 6th that both parties have resolved their
 differences, [DM] will have no alternative but to file a motion to withdraw on the
 grounds that co-plaintiffs have irreconcilable differences that necessarily require
 each party to have separate counsel.

DM expressed regret, but “the respective positions of the parties have left us no other

alternative.”

 The next morning, January 6, 2015, shortly after 10:00 a.m., DHA emailed DM, copying

Pivot, saying DHA was “caught completely off guard” that Pivot had fired DM and wanted to

clarify a few items: (1) DHA asked for at least a month to seek new counsel; (2) in the meantime,

it told DM it expected it “to continue to protect DHA’s interests, particularly as it relates to

[Pivot’s] attempt to settle out from under us and secure any offsets or credits against any future

awards;” (3) DHA asserted it would not be responsible for any outstanding bills Pivot “has

refused to pay,” claiming Pivot hired DM and agreed “with both of us that they would pay you”

and that Pivot had broken its “agreement with us and failed to uphold their responsibility to pay

your fees;” and (4) DHA asked for DM to gather its files as soon as possible in anticipation of

inspection by new counsel.

 DM wrote back within an hour to “clear up some items in your email.” First, despite

being instructed to discontinue work on the case by Pivot, DM said DHA “was never

unrepresented by [DM] and nothing has transpired that has adversely affected DHA in any way.”

But, as to “continuing to represent DHA’s interests,” DM explained that once the trial court

grants the motion to withdraw, DM can take no action on either party’s behalf. And, in response

to DHA’s concern about Pivot settling, DM said it would “be surprised” if the case could settle

 4
without DHA and explained that any settlement will “necessarily require” DHA’s signature. As

to attorney’s fees, DM stated it will be asserting an attorney’s lien pursuant to statute, which

“essentially provides that [DM] would receive its fees from any settlement proceeds.” DM said it

would gather the files and assured DHA of its cooperation.

 A few minutes later, DM emailed everyone again: “It is my understanding that the parties

have been unable to resolve their irreconcilable differences.” DM explained that it had informed

the trial court of this development and the necessity of DM having to withdraw so that each party

can retain separate counsel, and the trial court told DM to file a motion to continue, which it

would do later that day. DM stated it planned to file a formal motion to withdraw the following

week. DM again expressed regret, but “it is impossible for us to have to answer to 2 masters that

have conflicting intended courses of action.”

 A few days later, on January 9, 2015, DHA emailed DM again for “more clarity.” DHA

asserted that “notwithstanding the joint representation agreement,” when DM “undertook our

representation it was with the understanding and condition that [Pivot] is solely responsible for

all legal fees and costs.” “With this in mind, please confirm that whatever lien you are claiming

for attorneys fees/costs is against [Pivot] only and that you are waiving any claim for attorneys

fees and costs from all other plaintiff parties.” And, again, DHA insisted that until it hired new

counsel, DM had an obligation to protect it from any adverse interests if Pivot accepts settlement

and DHA goes to trial and asked it to confirm that DM would take whatever action needed to do

so.

 The next written communication with DHA was not until February 11, 2015.

Meanwhile, in a February 3rd email from DM to Pivot, DM points out that it had agreed to

represent both Pivot and DHA “due to their mutuality of interest” acknowledged in the Joint

 5
Defense Agreement. DM reiterated how the irreconcilable conflict arose--Pivot deciding to settle

and DHA not wanting to settle--explained that DM informed both parties and was “hopeful that

our clients could get on the same page so that we could get this matter resolved to everyone’s

satisfaction.” Having concluded the parties “could not resolve this, the rules of professional

responsibility dictated that [DM] could not any longer serve 2 differing goals and objectives.”

DM told Pivot that DHA had retained new counsel and DM would file its motion to withdraw

the next day. DM also asked Pivot to contact DM to address the outstanding fees.

 DM’s motion to withdraw was filed on February 5, 2015, asserting the “irreconcilable

conflict” between DHA and Pivot. DM also filed a notice of attorney’s lien under § 484.130 in

the amount of $149,618.20 attaching to “any verdict, report, settlement, decision or judgment in

Plaintiffs’ favor.”2

 On February 11, 2015, DM sent a letter to DHA, enclosing a copy of the trial court order

granting the motion to withdraw, and informing DHA that DM had filed its attorney’s lien. DM

also asserted that the “lien on [DHA’s] cause of action attaches to a verdict, decision, settlement,

or judgment in Pivot’s favor regardless of who actually receives the funds.” Notwithstanding the

lien, DM asked DHA to “remit at your earliest convenience the monies owed for legal services

rendered that you agreed to pay when this litigation was undertaken on Pivot’s and [DHA’s]

behalf.”

 New counsel entered their appearances for Pivot and DHA, the petition was amended,

and the case proceeded to a jury trial in late 2015. Pivot and DHA each submitted a claim for

tortious interference, and DHA submitted a breach of fiduciary duty claim. The jury entered

verdicts in favor of DHA and against Pivot, but judgment was entered for DHA only on the

2
 All statutory references are to Mo. Rev. Stat. 2000.

 6
breach of fiduciary duty claim in the amount of $2.1 million. D&H and DHA appealed the

judgment, but Pivot did not. During the pendency of the appeal, D&H and DHA reached a

settlement agreement and jointly moved to dismiss their appeals. Pursuant to this Court’s

instructions upon dismissal, the trial court vacated the judgment against D&H, released the

appeal bond D&H had filed, and ordered D&H to deposit $160,000 into the court registry “to

address the notice of attorney’s lien filed in this lawsuit by [DM].” It is undisputed that the funds

in the registry represent settlement proceeds belonging solely to DHA, not Pivot.

 Thereafter, DM filed a motion to enforce its attorney’s lien. Because Pivot was no longer

a party to this action since the judgment pertaining to its claim had become final, it was granted

leave to intervene in the attorney’s lien proceedings. At an evidentiary hearing on DM’s motion,

the trial court heard testimony from Robert Devereux, former partner in the DM law firm,3 and

from Jeffrey Mental, managing member of DHA. The emails, letters and written documents

discussed above were admitted into evidence, along with DM’s billing statements, to support its

request for $142,590.34 in fees representing unpaid bills.

 Devereux testified about billing Pivot for fees on the D&H case and about the balance

due. He agreed that DM had never spoken with DHA about unpaid fees until the conflict

necessitating withdrawal arose. But, he said, during the entirety of the representation, DM never

understood that Pivot “was solely responsible for the attorneys’ fees incurred.” Regarding the

parties’ disagreement over settlement, Devereux testified that although conflicts are always

possible when representing two clients--which is why they addressed that in the Joint Defense

Agreement--DM did not, at the outset of the representation, anticipate that any “specific

3
 Robert Devereux’s brother, Joseph Devereux, Jr., handled this matter until he passed away in September of 2013,
after which Robert became involved. By the time of the evidentiary hearing, DM had dissolved its practice of law,
operating only to collect on unpaid accounts.

 7
particular conflict might arise between [DHA and Pivot].” Devereux explained they took on joint

representation because these entities had a “common goal” to prevail in their claims against

D&H; they “absolutely had the same interest and the same subject matter and the same stake”

against D&H. Devereux testified that DM believed it needed to withdraw because Pivot “decided

they needed to settle the case, and didn’t really care . . . what the settlement was,” while DHA

was “unwilling to settle at all at any price.” Devereux said “it became untenable” for DM to

serve two clients with such “divergent opinions” and “conflicting intended courses of action.”

Devereux testified that DM met with Pivot and DHA about this problem prior to sending the

emails about the clients’ irreconcilable differences.

 Mentel testified on behalf of DHA. He described DHA as being “secondary” in DM’s

representation in the D&H case, that Pivot was “primary” and would “control how the case

would go.” He agreed that DM represented DHA, but denied they had an obligation to pay.

Mentel believed there was an agreement between Pivot, DHA and DM that Pivot would be

solely responsible for DM’s fees. He testified that this was discussed in negotiations of the Joint

Defense Agreement, at which DM was present, but agreed that term was not included in that or

any other document.

 The trial court entered judgment granting DM’s motion to enforce the attorney’s lien. The

trial court found there was “no express written agreement regarding fees” between DM, DHA,

and Pivot. The trial court also found that there was “no express written agreement that DHA

would not be responsible or liable for attorney’s fees incurred on its behalf,” finding that DM

was not a party to the arrangement between DHA and Pivot under which Pivot was to pay DM’s

fees. Because there was no evidence of an express agreement, the trial court found that DHA’s

and Pivot’s “promise to pay the reasonable value of [DM’s] services is implied.”

 8
 The trial court also found no evidence to support DHA’s argument that DM had forfeited

its right to compensation for its services because it withdrew without just cause. The trial court

found that because Pivot wanted to settle and told DM to stop working on the case, but DHA did

not want to settle, there was conflict of interest justifying DM’s withdrawal. On this record, the

trial court found, forfeiture of the fee was not warranted.

 The trial court concluded that $123,777.84 was “the reasonable value for the services

rendered to Plaintiffs,” based on the complexity of the case, the customary legal fees in St. Louis,

the rate charged and the hours billed.4 The trial court ordered the clerk of the court to pay DM

that amount out of the court registry “in full satisfaction of the lien.”

 This appeal follows.

 III. Standard of Review

 As in all court-tried cases, a judgment enforcing an attorney’s lien is presumed correct

and will be affirmed unless it is not supported by substantial evidence, is against the weight of

the evidence, or erroneously declares or applies the law. Drake Development & Construction

LLC v. Jacob Holdings, Inc., 366 S.W.3d 41, 47 (Mo. App. S.D. 2012) (citing Murphy v.

Carron, 536 S.W.2d 30, 32 (Mo. banc 1976)).

 IV. Discussion

 Under the attorney’s lien statute, § 484.130, DM’s right to compensation is governed by

the “agreement, express or implied” it had with its clients.5 On appeal, DHA claims it had an

4
 After the evidentiary hearing, DHA requested that the trial court “divide” DM’s time entries between Pivot and
DHA, arguing that at most 50% of the billed time could be attributed to services provided to DHA. DHA also
argued that the time entries submitted by DM included services provided in other matters and instances where “two
attorneys billed for the service.” The trial court agreed that the requested “amount and scope” of fees was
“excessive” and cut them by $18,813 for “seemingly duplicative work.” The trial court did not apportion the fees by
client.

5
 Section 484.130 states:

 9
express agreement with DM that only Pivot would be obligated to DM for its fees and, therefore,

the trial court erred in imposing an implied agreement for DHA to pay those fees. In any event,

DHA argues, DM forfeited its right to recover fees when it withdrew from the case based on a

foreseeable conflict of interest between its two clients. DHA also argues that by ordering

payment of the entire amount of fees from its settlement proceeds, without dividing the amount

by client, the trial court ordered DHA to pay for services that only benefited Pivot. Imposing

joint liability on DHA for Pivot’s fees, it argues, was improper because there was no evidence

that it had intended to be jointly obligated for those fees. For the following reasons, we find that

none of these arguments have merit.

A. Right to Recover Fees

 Points I, II, and III raise against-the-weight-of-the-evidence and no-substantial evidence

challenges. To show that a particular finding is not supported by substantial evidence, DHA must

identify the favorable evidence on that proposition and demonstrate why it and the reasonable

inferences drawn therefrom do not have probative force, such that the trial court could not

reasonably make that finding. See Houston v. Crider, 317 S.W.3d 178, 187 (Mo. App. S.D.

2010). “We view the evidence and the reasonable inferences drawn from the evidence in the light

most favorable to the judgment, disregard all evidence and inferences contrary to the judgment,

and defer to the trial court’s superior position to make credibility determinations.” Id. at 186.

Reliance on contrary evidence has no place in a no-substantial-evidence challenge, and failure to

identify the favorable evidence in the record is also fatal. Id. at 186, 187-88.

 The compensation of an attorney or counselor for his services is governed by agreement, express or
 implied, which is not restrained by law. From the commencement of an action or the service of an
 answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's
 cause of action or counterclaim, which attaches to a verdict, report, decision or judgment in his
 client's favor, and the proceeds thereof in whosesoever hands they may come; and cannot be affected
 by any settlement between the parties before or after judgment.

 10
 An against-the-weight-of-the-evidence challenge presupposes the existence of substantial

evidence supporting the proposition in question, but, nevertheless, “challenges the probative

value of that evidence to induce belief in that proposition when viewed in the context of the

entirety of the evidence before the trier of fact.” Id. at 186. While contrary evidence is part of the

weighing process in an against-the-weight challenge, the failure to accurately identify all of the

favorable evidence strips that process of “any analytical value or persuasiveness.” Id. at 189.

 Express or Implied Fee Agreement

 In its first two points on appeal, DHA challenges the trial court’s finding that there was

no agreement to which DM was a party that expressly absolved DHA of an obligation to pay for

the legal services it received from DM. Rather, the trial court found that only Pivot and DHA had

agreed to the arrangement under which only Pivot was obligated to pay DM’s fees. DHA

contends this finding is not supported by substantial evidence and is against the weight of the

evidence. We disagree.

 To determine whether there was an express agreement regarding fees, we look for the

essential elements of a contract: offer, acceptance, consideration, and mutuality; that is, “whether

there was a meeting of the minds and mutual assent to the essential terms of the agreement.”

Woodson v. Bank of America, N.A., 602 S.W.3d 316, 323 (Mo. App. E.D. 2020). Mutuality “is

determined by looking at both the intentions of the parties as expressed or manifested in their

words or actions, and the circumstances surrounding the parties’ relationship.” Id. Mutuality of

understanding between the lawyer and the client is necessary, as is true in all contractual

relationships, to protect both parties. See In re Crews, 159 S.W.3d 355, 360 (Mo. banc 2005).

 DHA argues that the only favorable evidence tending to show there was no express

agreement is the lack of a written fee agreement and the lack of any terms regarding fees in the

 11
Joint Defense Agreement or the Contribution Agreement. DHA argues the mere absence of

written fee terms does not tend to prove there was no fee agreement, only that it was not included

in any writing. DHA argues there is no reason DM’s fees would be addressed in the Contribution

Agreement entered only between Pivot and DHA prior to retaining DM. Likewise, it argues, the

Joint Defense Agreement was intended only to address the parties’ agreement to “protect shared

information” and not intended to address details--such as fees--of DM’s representation. But the

absence of written terms is not the only evidence supporting the conclusion that DM did not

expressly agree that, or assent to an agreement under which, DHA was relieved of responsibility

for its legal fees. The email exchange in late December of 2014 and early January of 2015, when

construed in the light most favorable to the judgment, is probative evidence on this issue.

 For instance, when Pivot told DM it was out of money and asked to make other

arrangements for paying DM--suggesting it could ask DHA to help--DM responded that “all

parties” needed to work through this issue. It is reasonable to infer from this exchange that DM

believed all parties, including DHA, were responsible for and should participate in paying the

fees. Pivot did nothing to dispel that belief by responding that it would get DHA involved. When

DHA asserted that it was not responsible for fees on January 6th DM responded by stating it was

asserting a lien that would attach to any settlement, which settlement it believed could not occur

without DHA. And, when a few days later DHA asked DM to “confirm” that its only claim for

fees is against Pivot and that it is waiving any claim for fees as to anyone else, DM did not

confirm that arrangement. Rather, the next communication referencing this particular issue is

DM’s letter of February 11th asking DHA to remit monies owed for the legal representation DM

undertook on behalf of Pivot and DHA. The reasonable inference from this exchange is that DM

did not confirm DHA’s understanding of the fee agreement, it rejected it. Moreover, Devereux

 12
testified that at no point during the entirety of its representation of Pivot and DHA did DM

understand that Pivot was to be solely responsible for payment of the legal fees. The above

evidence is substantial and demonstrates the parties did not have a meeting of the minds that

DHA was absolved of any responsibility to pay for DM’s legal services.

 Nor is the trial court’s finding on this issue against the weight of the evidence. DHA’s

against-the-weight challenge fails for the same reason the no-substantial evidence challenge

does: the failure to correctly identify all the evidence favorable to the judgment. DHA contends

that the way DM handled the unpaid bills dispute in the late December and early January emails

is evidence contrary to the judgment, showing that DM expressly agreed that DHA would not be

responsible for fees. But, as we concluded above, when viewed in the light most favorable to the

judgment, those communications and the reasonable inferences therefrom are evidence favorable

to the judgment. DHA’s failure to accurately identify all of the favorable evidence strips its

analysis of the weight of the evidence of any “value or persuasiveness.” Id. at 189.

 Moreover, the other evidence DHA relies on as “contrary”--namely, the fact that DM was

aware of Pivot’s and DHA’s arrangement and dealt only with Pivot regarding the bills--does not

lessen the probative value of the favorable evidence on this proposition. It was still reasonable

under the totality of the evidence--including DM’s rejection of DHA’s assertion that it was not

obligated to pay--for the trial court to conclude that DM had not expressly agreed that only Pivot

was responsible for its fees.

 DHA also points to a 2015 petition DM filed against Pivot in St. Louis County to recover

the same unpaid fees sought here, claiming there are allegations therein that show DM’s express

agreement that only Pivot was responsible for payment.6 DHA contends that DM is bound by the

6
 Prior to the hearing on the lien, the St. Louis County case was stayed pending the outcome of this case and has
since been dismissed without prejudice.

 13
allegation therein as admissions of fact. Allegations of facts, as opposed to conclusions of law,

may constitute an admission by the pleader that obviates the need for any evidence on that issue.

See generally Adams v. Le Bow, 172 S.W.2d 874, 880 (Mo. App. 1943); see also Acetylene Gas

Co. v. Oliver, 939 S.W.2d 404, 409 (Mo. App. E.D. 1996); but see Frick’s Meat Products, Inc. v.

Coil Construction of Sedalia Inc., 308 S.W.3d 732, 738 (Mo. App. E.D 2010) (“allegation of a

legal conclusion in a pleading, such as the existence of a valid and enforceable contract, is not an

admission of fact that is binding on the party”). But here, while DHA did offer the petition into

evidence, it did not argue to the trial court that the statements therein constituted admissions of

fact binding on DM. Nor did it rely solely on that petition as proof that DM had agreed DHA

would not be responsible to pay its legal fees. Rather, DHA introduced other evidence on that

issue, including documents and Mentel’s testimony. Moreover, DHA did not object when DM

introduced evidence on the issue, including Devereux’s testimony that DM never understood

Pivot was solely responsible for DHA’s legal fees, contrary to the supposed admissions in the St.

Louis County petition. Under these circumstances, DM is not bound by the statements in that

petition in this case. See Hobbs v. Director of Revenue, 109 S.W.3d 220, 222–23 (Mo. App. E.D.

2003) (finding that admission was not binding when adversary introduces contrary evidence at

trial or when admission is denied by pleader at trial without objection from adversary).

 In sum, the evidence showed there was no express agreement between DM and DHA to

absolve DHA of responsibility for paying DM for its services. The trial court’s conclusion on

this issue is supported by substantial evidence and is not against the weight of the evidence. In

the absence of an express contract regarding attorney’s fees, “the universal rule” is that a

“promise to pay the reasonable value of an attorney’s services is implied.” Roberds v. Sweitzer,

733 S.W.2d 444, 447 (Mo. banc 1987) (internal quotation marks and citations omitted); see also

 14
Craig v. Jo B. Gardner, Inc., 586 S.W.2d 316, 325 (Mo. banc 1979). Thus, the trial court

correctly imposed an implied promise in this case. Points I and II are denied.

 We turn now to whether DM forfeited the right to compensation under that implied

promise when it withdrew its representation before trial based on the conflict of interest between

Pivot and DHA.

 Forfeiture of Fee

 The general rule is that a lawyer who withdraws from a case without justifiable cause

before termination of a case forfeits his right to compensation for the services he rendered.

International Materials Corp. v. Sun Corp., 824 S.W.2d 890, 894 (Mo. banc 1992). “Mandatory

withdrawal for ethical considerations is one factor a court may consider in determining whether

or not there is justifiable cause so as to permit a recovery of compensation.” Id. at 895. But

complete forfeiture of a fee is only warranted “when a lawyer’s clear and serious violation of a

duty to a client is found to have destroyed the client-lawyer relationship and thereby the

justification for the lawyer’s claim to compensation.” Id.; see also Restatement (Third) Of The

Law Governing Lawyers § 37 (2000). “Forfeiture is generally inappropriate when the lawyer has

not done anything willfully blameworthy, for example, when a conflict of interest arises during a

representation because of the unexpected act of a client or third person.” Restatement (Third) Of

The Law Governing Lawyers § 37 (2000); see also International Materials, 824 S.W.2d at 895

(“where an unforeseeable conflict of interest arises after the attorney accepts the client's case, the

award of a fee is permissible”).

 The trial court cited the standards set out in International Materials and found that DM

had just cause to withdraw based on the clients’ conflicting positions regarding settlement and

 15
that forfeiture of DM’s fee was inappropriate on this record. In its third point on appeal, DHA

contends this finding was not supported by substantial evidence. We disagree.

 DHA claims there was no evidence this conflict of interest was unforeseeable, citing the

fact that the parties acknowledged the potential for conflicts in the Joint Defense Agreement. It

claims that, under the Rules of Professional Conduct relating to settlements involving two

clients, the agreement contemplated this particular settlement conflict between Pivot and DHA.

But Devereux testified that DM did not envision this particular conflict at the outset because

these parties’ interests were absolutely aligned at that point. The trial court was free to believe

that testimony.

 In any event, to the extent the conflict was foreseeable, as DHA acknowledges, forfeiture

of the fee was only warranted if the trial court also found that DM’s conduct in handling that

conflict was a serious dereliction of its duties that destroyed the relationship with DHA and its

right to compensation. See International Materials Corp., 824 S.W.2d at 895. DHA contends the

email chain in early January of 2015 regarding DM’s withdrawal showed that DM violated its

duties of loyalty and trust by “[f]orcing [DHA] to agree to settle, threatening to withdraw with

less than 24 hours’ notice if [DHA] refuses to settle, with knowledge that [DHA] is not interested

in settling, and withdrawing based on a conflict inherent in the representation since the outset.”

First, even if those emails could reasonably be construed as forceful threats, that would be

evidence contrary to the trial court’s conclusion that forfeiture was not warranted, and reliance

on evidence contrary to the judgment is misplaced in this no-substantial-evidence challenge. See

Houston, 317 S.W.3d at 186. Second, construed as they must be--in the light favorable to the

judgment--those emails, along with Devereuex’s testimony, support the trial court’s conclusion

that forfeiture of the fee is not warranted here.

 16
 For instance, when the conflict arose, Devereux testified he met with DHA and Pivot

prior to sending the emails. In those emails, DM did not force DHA to accept settlement; it asked

the parties to resolve their differences. Nor did DM present an ultimatum with a less than 24-

hour deadline. Rather, it explained that time was of the essence with the trial date approaching

and that ethical mandates would require withdrawal if the two clients continued to have such

divergent intentions. When it became clear the conflict could not be resolved, Devereux

explained why it could not continue to represent them both and they would each have to retain

separate counsel. Meanwhile, DM sought and was granted a continuance of the trial date,

continued communicating with the clients about deadlines and the parameters of its withdrawal,

and cooperated in the transfer of the case to new counsel. Foreseeable or not, the evidence

showed that DM’s handling of the conflict once it arose did not violate any duty of loyalty or

trust nor destroy the attorney-client relationship such that complete forfeiture of its fees was

warranted.

 The trial court’s conclusion that DM had just cause to withdraw and that forfeiture of fee

was not appropriate in this case is supported by the substantial evidence. Point III is denied.

 Having found that DM had a right to recover its fees, the trial court determined that

$123,777.84 was “the reasonable value of services rendered to Plaintiffs,” meaning Pivot and

DHA collectively, and entered judgment against “Plaintiffs” in that amount. The clerk of court

was ordered to pay that amount from DHA’s settlement funds deposited into the court registry by

D&H in full satisfaction of the attorney’s lien. We proceed now to address the propriety of

ordering fees in this manner.

B. Payment of Fees

 17
 Points IV and VI challenge the trial court’s application of law. We review these claims of

error de novo. See Golf Club of Wentzville Community Homeowners Association v. Real Homes,

Inc., 616 S.W.3d 339, 342 (Mo. App. E.D. 2020). In its fourth point, DHA argues that the trial

court misapplied the law by ordering payment of the entire amount of DM’s fees, including those

for services provided to Pivot, because it held DHA jointly liable for Pivot’s fees without any

evidence that DHA and Pivot intended to be so jointly obligated. Rather, DHA argues in its sixth

point, the trial court was required to specify how much of the $123,777.84 represented the

reasonable value of services provided to DHA alone and order only that amount paid out of the

settlement funds in the court registry. We disagree.

 Joint Liability

 “Where two or more persons undertake the performance of an obligation, the

presumption is that the undertaking was joint.” Schubert v. Trailmobile Trailer, L.L.C., 111

S.W.3d 897, 902–03 (Mo. App. S.D. 2003) (internal citations omitted, emphasis added). When

“two or more promisors are jointly bound to fulfill” obligations under a joint contract, either of

them “may be charged with the entire liability under the contract.” Id. Moreover, an “agreement

between promisors that their liability shall be several does not affect the rights of the promisee,

where the promisee intends that their liability shall be joint and is justified in such intention.”

Illinois Fuel Co. v. Mobile & O.R. Co., 8 S.W.2d 834, 840 (1928) (internal quotation and

citations omitted).

 Here, DHA and Pivot jointly engaged DM to pursue their mutual interest in prosecuting

claims against D&H, as evidenced by the Joint Defense Agreement. The trial court found that by

accepting DM’s legal services, the “Plaintiffs,” meaning Pivot and DHA, had impliedly

promised to pay DM the reasonable value of those services. In this context, that implied promise

 18
to pay for the joint representation is presumed to be a joint obligation. The fact that Pivot and

DHA had a different arrangement between themselves does not overcome that presumption in

this case.7 It is evident from the record that DM expected and intended, justifiably, to be able to

recover fees from either of the two clients that received its services under the Joint Defense

Agreement.

 Apportionment of Fees

 Similarly, we find no merit in DHA’s assertion that Missouri law required the trial court

to consider and make a separate finding of the reasonable value of the services with respect to

each client in this case. None of the cases cited by DHA in support of this proposition even

address the payment of attorney fees when multiple clients are represented by a single attorney,

much less impose any such requirement on the trial court to apportion fees by client. Rather, the

cited cases involve multiple attorneys and address how to determine which lawyers receive what

fees. See Craig, 586 S.W.2d at 320; Plaza Shoe Store, Inc. v. Hermel, Inc., 636 S.W.2d 53, 54

(Mo. banc 1982); Roberds, 733 S.W.2d at 447; International Materials Corp., 824 S.W.2d at

890.

 DHA failed to demonstrate that ordering payment of the entire amount of fees paid from

its settlement process without apportioning the fees between Pivot and DHA was a

misapplication of the law. Points IV and VI are denied.

C. Moot Points on Appeal

 Points V and VII are both premised on this Court reversing the judgment. In its fifth

point, DHA asserts that if we conclude DHA has no liability to DM for its fees, then it would be

a misapplication of law to use DHA’s settlement proceeds to satisfy this judgment as to Pivot. In

7
 Whether DHA has a claim for reimbursement against Pivot pursuant to this arrangement is, of course, an entirely
separate matter not before us in this case.

 19
its seventh point on appeal, DHA contends the trial court erred by not staying the payout order

pending appeal, arguing it “may have no ability to recoup the funds from [DM],” which is now

defunct, “should [DHA] prevail in this appeal.” Because we find DHA is liable to DM for fees

and has not prevailed on appeal, Points V and VII are denied as moot.

 V. Conclusion

 For the foregoing reasons, the judgment is affirmed.

 _______________________________
 Colleen Dolan, P.J.

Robert M. Clayton III, J., concurs.
Kelly C. Broniec, J., concurs.

 20